# EXHIBIT 103

EXAMINATION UNDER OATH

EXAMINATION UNDER OATH OF JULIO RAVADA — Claim No. 7007678692-1

EXAMINATION UNDER OATH OF JULIO RAVADA

APPEARING REMOTELY FROM RIVERSIDE COUNTY, CALIFORNIA

TAKEN ON BEHALF OF

FARMERS DIRECT PROPERTY AND CASUALTY INS. CO.

SEPTEMBER 27, 2024

9:59 A.M.

REPORTED BY: RENÉE C. FRITZ, CSR NO. 6910

APPEARING REMOTELY FROM SAN DIEGO COUNTY, CALIFORNIA



PLAINTIFF'S EXHIBIT PL103-001

REMOTE APPEARANCES:

For Farmers Direct Property and Casualty Ins. Co.:

GORDON & REES SCULLY MANSUKHANI, LLP
JOHN S. NA
633 West Fifth Street, 52nd Floor
Los Angeles, California 90071
213.576.5000
jna@grsm.com

INDEX TO EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| By Mr. Na | 5 |




PLAINTIFF'S EXHIBIT
PL103-003

INDEX TO EXHIBITS

EUO OF JULIO RAVADA

Friday, September 27, 2024

Renée C. Fritz, CSR No. 6910

(All exhibits provided electronically to the reporter)


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter to Julio Ravada from John S. Na dated September 12, 2024 | 49 |
| Exhibit 2 | Proof of Loss dated 6/10/24 | 54 |
| Exhibit 3 | Palm Springs PD Police Report | 110 |
| Exhibit 4 | Receipts | 120 |
| Exhibit 5 | Kings Power Electric Inc. Estimate dated July 16, 2024 | 126 |
| Exhibit 6 | Photograph of table, corner hutch and painting | 130 |
| Exhibit 7 | Group of Emails between Julio Ravada and Mark Bercier | 143 |
| Exhibit 8 | Zillow listing for 2275 E. Belding Drive, Palm Springs, CA 92262 | 150 |




PLAINTIFF'S EXHIBIT PL103-004

REPORTED REMOTELY FROM SAN DIEGO, CALIFORNIA;
FRIDAY, SEPTEMBER 27, 2024; 9:59 A.M.

JULIO RAVADA,
having been first remotely duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. NA:
Q. Good morning, Mr. Ravada.
A. Good morning.
Q. Nice meeting you by video. I know we've exchanged emails a couple of times, but I don't think we've ever spoken on the phone before, but it's nice meeting you and thank you for meeting with me here today for your examination under oath.
A. Thank you.
Q. For the record, can you state and spell your full name?
A. Julio, J-u-l-i-o, Ravada, R-a-v-a-d-a.
Q. And do you have a middle name?
A. Yes. Rodolfo, R-o-d-o-l-f-o.
Q. I'm sorry one more time. R-o-d --
A. -- o-l-f-o.
Q. Okay. And other than the name you've just given


PLAINTIFF'S EXHIBIT PL103-005

us, have you used any other names in the past?

A. Yes.

Q. Okay. And what name have you used?

A. So it's Julio Rodolfo and then the last name is long. It's Ravadachavarria. So it's R-a-v-a-d-a-c-h-a-v-a-r-r-i-a.

Q. Is that all one word or is that two separate words?

A. When I moved to this country, that's what my legal name would be. One word, yeah. But it's supposed to be two different last names, but the U.S. Immigration put it as one word.

Q. One word? Okay.

A. Yeah.

Q. And any other names besides the one you've just given us?

A. No.

Q. And when was the last time you used the name Julio Rodolfo Ravadachavarria?

A. Well, I became a U.S. citizen, I want to say, approximately 12 years ago, so that's when I was able to legally change my name. And that's when I basically submitted a change for my name to what it is current right now.

Q. Okay.



PLAINTIFF'S EXHIBIT PL103-006

A. So that would be the last time.
Q. Okay. Do you mind if I call you Julio or Mr. Ravada during the entirety of the --
A. Julio.
Q. Julio. Okay. Perfect.
So Julio, have you ever had an examination under oath before?
A. Yes, I have.
Q. Okay. And when was that?
A. One through my job and another one through another claim from Farmers.
Q. Farmers?
A. Yeah.
Q. Okay. When you say through your job, was that a deposition or an examination under oath?
A. I think -- well, I mean, I know my company's lawyer and me, we went and then met the other party's attorney and the plaintiff and we sat down, and so his attorney got to question me and then my attorney questioned him.
Q. Okay. Was that related to a lawsuit?
A. Yes.
Q. Okay. So that's probably more of a deposition than an examination under oath.
A. Okay.


PLAINTIFF'S EXHIBIT
PL103-007

Q. Yeah. I mean, it's similar, but it's slightly different.
Do you remember when that was approximately? How many years ago or months ago?
A. Five years ago maybe.
Q. Okay. And was that in connection with any insurance claim?
A. No.
Q. Okay. Just very quickly, what was the nature of that lawsuit, if you remember?
A. I had terminated the associate, and so he was suing the bank for wrongful termination.
Q. So it's employment related?
A. Yeah.
Q. Okay. Perfect. Got it.
And then the prior claim from Farmers where you had an EUO, do you remember when that was?
A. I want to say October last year.
Q. And was that here in California?
A. Yes, it was.
Q. Was it a property claim?
A. Yes, it was.
Q. Was it at the same loss location as the current claim that we're here about today?
A. That is correct.

Q. Okay. And do you remember the result of that claim? Was it paid out or is it still open, ongoing? What is the status?

A. It was declined, but I am basically -- because I have a year to bring it up, so I'm working on -- on disputing it on the dispute.

Q. And do you know what the basis for the denial was?

A. What did they say? That it was -- so based on what they're saying that I -- that I lied about an event. But when I -- you know, well, that's what they're saying.

Q. Okay.

A. So that's --

Q. So it was based on a misrepresentation?

A. That's what -- yeah --

Q. Okay.

A. -- according to Farmers.

Q. Got it.

So you probably remember when you had your EUO or your examination back in October of 2023, I imagine it was done by an attorney, kind of like this. It may have been done remotely just like this, but before you began, I imagine the attorney went over some ground rules.

A. Yes.

Q. Probably called it an admonition.



PLAINTIFF'S EXHIBIT PL103-009

A. I don't recall that.
Q. Okay. Well, I'm going to go through a couple of them before we proceed with your examination.
First of all, I need you to understand that you're testifying here today under oath. Do you understand that?
A. Yes.
Q. Okay. Even though we're in an informal setting -- you're obviously, I imagine, at your home you said in Riverside County. I'm in my office. We're doing this remotely -- I need you to understand the testimony you're about to give carries the same weight as if you were testifying in a courtroom before a judge and a jury. Okay?
A. Okay.
Q. What's going to happen is I'm going to be asking you a series of questions to which I'm entitled to what's called your best testimony. And what that means is in answering my questions, I do not want you to make any guesses, but if you can answer my question using estimates, then I'm entitled to your estimate.
So that we're on the same page, a guess is something for which you have no basis in answering. So if I asked you what color's my car, for example, unless you saw me drive a car, for you to give an answer would


PLAINTIFF'S EXHIBIT PL103-010

be a complete guess; right?
But if somebody was to ask you tomorrow, you know, what color are John's eyes or his hair -- right? -- even though you may not know, just based on your observation of me through this camera right now, you could give an approximate estimation as to what color you think my eyes are or my hair color is. Okay. So that's the difference between a guess and an estimate. And I only bring that up so that you and I are on the same page.
A. Can I ask something?
Q. Absolutely.
A. So basically, what you're saying is when you ask me for something, if my response in my head is going to be an estimate, that I should tell you first -- that I should warn you about like if it's an estimate or a guess or --
Q. That's totally up to you. But typically, that's the way the insureds will respond when I've done this in the past -- right? -- if they don't know for sure but they can make an estimate, then they will let me know that it's an approximation or an estimation.
A. Okay.
Q. Something along those lines; okay?
A. Sounds good.


PLAINTIFF'S EXHIBIT PL103-011

Q. Okay.
A. I'm also trying to do my best in trying to wait for you before I begin answering.
Q. Exactly. That was going to be the next thing I'm going to say. The court reporter online is creating a verbatim record of our conversation or our examination here today, and so to the extent that -- you know, for her to prepare an accurate record, one of us should speak at a time. We should avoid talking over each other.
And also, because she's creating a record of what's said, you know, hand gestures, nodding of the head, things like that, will not get picked up in the record. Okay?
A. Okay.
Q. At the conclusion of today's proceeding, you will receive a transcript of today's proceeding by email from the court reporter's office. You will have the opportunity to review the transcript to make sure that it accurately reflects your testimony here today. You have the opportunity to make changes to the transcript to make sure that it is accurate, and then you will be signing the transcript under penalty of perjury, and then you will be returning it to my office. Okay?
A. Okay.
Q. The one admonition about making changes to the

transcript, if the changes are to something that's deemed material, meaning it's very important or very significant to the claim, that could have a potentially damaging effect on your credibility, which then could have a potentially damaging effect on the claim.

So going back to my earlier admonition about estimates and guesses. It's very important that, you know, we get your best testimony here today on the record. Okay?

A. Okay.

Q. And then because we are in different locations and we're kind of at the whim of our, you know, Wi-Fi connection, in the event we somehow get disconnected for any reason, is there a number that I can reach you at?

A. No. Unfortunately, my cell phone fell into the septic tank at my house.

Q. Oh, okay.

A. I know. So I don't --

Q. There's no landline that I can reach you at at home?

A. I don't have a landline.

Q. Okay. Got it. All right. Well, hopefully we won't get disconnected.

A. However, I want to say if you have an iPhone, you can call me through -- like if you were to call me

through FaceTime, but without FaceTime, audio time, we can do that.

Q. Okay. And what number would I call for that?

A. My cell phone, which is 213-925-4069.

Q. Perfect. All right.

Okay. Julio, have you ever had any felony convictions in the state of California?

A. No. I apologize. A felony, no. No felony. A DUI when I was 22, but I mean, that was not --

Q. Okay. And this is something I tell all the insureds when I take their examination under oath. I'm not singling you out by any means, but I'm making you aware that there is a provision in the policy which essentially states if there's been any fraud, concealment or misrepresentation in the presentation of the claim, the claim can be denied. Again, I'm not saying you've done any of that. I'm just making you aware that such a provision exists in the policy. Okay?

A. Okay.

Q. Do you have any questions for me at this time?

A. No. Thank you.

Q. Perfect.

Okay. So we are here regarding Claim Number 7007678692-1, with a date of loss of June 3rd, 2024 from, I presume, your property located in Palm Springs,


PLAINTIFF'S EXHIBIT PL103-014

California. I don't expect you to remember the claim number, but with respect to the date of loss and the location of the loss, does that sound accurate?
A. Yes.
Q. Okay. Great.
Moving right along. What is your current home address, Julio?
A. 2275 East Belding Drive, Palm Springs, California 92262.
Q. And is that the address where the loss occurred?
A. Yes.
Q. Is that a house or an apartment, condo?
A. House.
Q. Do you own or rent?
A. Own.
Q. Is that where you're currently located right now?
A. Yes.
Q. And how long have you resided at that location?
A. Since September 2022.
Q. Okay. And since you purchased the property, have you lived alone or has anyone else lived there with you?
A. I want to correct something.
Q. Sure.


PLAINTIFF'S EXHIBIT PL103-015

A. I purchased the property in September 2021.
Q. Okay.
A. But I moved in here on September 2022.
Q. Okay. Got it. Thank you for that clarification.
A. So the next question, if somebody has lived in here?
Q. Yeah.
A. When I moved in here, my ex -- my partner that we were living in the other house, we both moved together, so that was that. And then my mom stayed here for like three months at one point as well.
Q. Okay. Do you remember the approximate timeframe when your ex lived with you at that location?
A. Yeah. So from -- so I guess from July -- what happened was that he and I were coming from this house from July 2022, and then we were going back and forth between the two houses, but the other house was my primary home still. And then we had this case of domestic violence on September 29th when he got arrested, and per the D.A.'s recommendation, I needed to relocate -- move away from my home because it wasn't safe. So that's when on September 29th, I made a choice to then move officially to Palm Springs. And then my ex was sentenced for a year in jail but, however, he got


PLAINTIFF'S EXHIBIT PL103-016

released five months after he was detained, which was on March of 2023. And then I forgave him, and he came back here to Palm Springs. But then he moved out on April 17th of 2023 after a fight. And then he died on August of 2023.

Q. I'm sorry. Did you say he died?

A. Yeah.

Q. I am sorry to hear that.

A. Thank you.

Q. Okay. So it sounds like -- if I understand your testimony correctly -- by the way, what is your ex's name?

A. Robert.

Q. Robert?

A. Cannon.

Q. I'm sorry. What was the last name?

A. Cannon. Like the printer, Cannon.

Q. So it sounds like Mr. Cannon resided at the location in Palm Springs from approximately September of 2022 to March?

A. No. That was the time when he was in jail.

Q. Okay.

A. So he was here all the time, like from July, July to September. I was going back and forth between the two houses, the one in Reseda and one here. But when

he physically attacked me on September 29th in L.A., my house in L.A., that's when he gets arrested, and --
Q. Okay.
A. -- I then decided to move here permanently.
Q. Okay. And so after you moved there permanently, Mr. Cannon was no longer there, is that accurate, because he was there only from July to September 2022?
A. In this property, yes. But he got release out of jail on March 7th, 2023, and he ended up coming here again.
Q. But then he moved out again in April?
A. 17th, yeah.
Q. Of '23? Okay. Got it.
And then you said your mom also stayed there for about three months?
A. Yes.
Q. Do you remember the period of time of that stay by your mom?
A. I mean, she always wants to stay longer.
Q. Well, let me ask you this. Did she live there or was she just like visiting?
A. Well, my mom, she lives in Ecuador, but then she also comes here in the states here for awhile.
Q. Right.
A. She stayed. And then when she came here, she


PLAINTIFF'S EXHIBIT PL103-018

was living here, you know, for like three months.
Q. Okay.
A. Yeah.
Q. So let me ask you this. When was the last time that your mom was there at the Palm Springs property?
A. Approximately a month and a half ago.
Q. So about July of this year?
A. Yes.
Q. Is that when she left or when she --
A. When she was here last time.
Q. And how long was she here?
A. That time, one day.
Q. Okay. So she doesn't live there. She just comes to visit from Ecuador; is that a fair statement?
A. That is a fair statement. But when she stayed here for three months, that must have been -- I think that was in January through March of this year.
Q. Okay. At the time of the loss in June of 2024, was there anybody living at the property other than you?
A. No. Just me and my dog.
Q. Okay. Now, you said you purchased this property in September of 2021, but you didn't move in until September of 2022; is that correct?
A. Yes.
Q. So during that one-year gap, what were you doing


PLAINTIFF'S EXHIBIT PL103-019

with the property?

A. I had initially purchased this property with the intention of making it an Airbnb and also to have a place that, for example, I can also be my vacation home/Airbnb.

And when I was given the keys, I then wanted to have somebody redo the floors, so that took awhile. And I found a contractor, and then this guy basically was coming here all the time. I also wasn't following up a lot on him until maybe, I want to say, on May or June. He kept asking for money and then I wouldn't see any results, you know. And then because my twin sister recommended him, she ended up like calling him and telling him off. He got upset. He abandoned the project. I come here in July and he had destroyed the floor -- he had like took my money and basically left the place a big mess.

So that's when my ex, who knew about construction, he told me -- and we had been together already for two years -- he told me that he thought it was a good idea for him -- to let him have the work, you know, that he would do it. That he appeared to me that -- and so he ended up basically moving in here, but it was the same thing. He wasn't answering and I wasn't sure like what he was doing. He would be gone most of the time. He was stealing things from me. And that's


PLAINTIFF'S EXHIBIT PL103-020

when I started like coming here more often, like every weekend or like, you know, just to make sure everything was getting done.

And then we start having arguments, domestic violence. He started getting violent more and more. And that's basically how it all happened.

Q. Okay. So what was the name of this contractor that you had found?

A. Julio Sanchez.

Q. Okay. So Mr. Sanchez was recommended by your sister you said; correct?

A. Right. Twin sister.

Q. And then, for whatever reason, he didn't work out. And so then your ex, Mr. Cannon, said he would take over and do the repairs?

A. Yeah.

Q. Okay. Did he finish the repairs?

A. No.

Q. Okay. Were the repairs ever finished?

A. Yeah.

Q. Okay. When was the repair finished?

A. On July 4th of last year.

Q. July 4th --

A. Yeah.

Q. -- of 2023?


PLAINTIFF'S EXHIBIT
PL103-021

A. Yeah.

Q. Okay. And when you say "repairs," I mean, what are we talking about? Are we talking about like redoing the entire house, or what was the scope of the work that was done?

A. It was the floors. It was to like to build the sunk in and then the floors, to have the whole entire floors done.

So they did good work at like taking -- removing the floor, like, you know, but they -- nobody basically got to that end. But then on -- when he got out of jail, the floors were still not done, so he started helping me, and then like we both did them, but it didn't look quite right. So I ended up basically paying -- saving money and then paying somebody to come and do the epoxy floors, and then he finished it on June 29th of 2023.

But then on July 3rd, that's when I had a guy come here, sent by my ex -- that's my allegation -- drug me, stole most of the things from my house, raped me, and destroyed the floors. And there were three people.

And so that case is still pending and that is the case that Farmers denied. That is the case that is still -- one person is arrested.

So then I started doing -- I basically took over and finished the floors like --

Q. Okay. There's a lot to unpack there. I do apologize or, you know, I hope you're doing better now than what it sounds like had been a horrible July 3rd event.

Let me just try to stay focused on my initial question, which was, you know, what was the scope of the work that you had done at the house. So you said it was mainly the floors and then I think you said sunken -- like sunken floor; is that correct?

A. Yes.

Q. Anything else, other than the floors, that you had done between the time period of September 2021 and September 2022? For example, did you repaint the house?

A. Yeah.

Q. Did you put in new carpeting?

A. Well, no. But because the entire floor was removed and epoxied the entire house.

Q. So the entire floor in the entire house was done?

A. Yeah.

Q. You painted the interior and the exterior?

A. Yes.

Q. Did you do any framing, any remodeling?

A. No. However, I got a permit from the City to remodel the bathrooms. But it was -- this is around the


PLAINTIFF'S EXHIBIT
PL103-023

time when like my ex and I were fighting and like I was just like losing money, so it's all pending, but nothing has happened.

What I did outside, I did on the patio, like we removed a lot of the plants that were here and poured concrete around the areas to make it look more like clean, I guess.

Q. Uh-huh.

A. Yeah.

Q. Okay. So did you ever remodel the bathroom?

A. No. Like we got -- okay. Yes and no. Meaning that so I didn't get to do what the -- what I had applied for in the City. So only like, for example, the sink was changed. Like the toilet was changed, like, you know, stuff like that. But we -- I didn't get to like even start on actually like, you know, changing the plumbing and all of that because I just ran out of money.

Q. Okay. So you just changed the fixtures?

A. Yes.

Q. Okay. Is that in all -- I don't know how many bathrooms are in the house, but is that in all the bathrooms?

A. Yes.

Q. Okay. What about like a tub, did you change the tub?


PLAINTIFF'S EXHIBIT PL103-024

A. No. Like there is no tubs.
Q. Okay. Did you like retile the showers?
A. The tiles were removed, so in one bathroom -- yes, so the tiles were removed in all the showers, and then it was left in like concrete finish because I either have to like buy new tiles, which was expensive, and then pay somebody. So I just paid him to like leave them with concrete finish. So it looks like a sauna, two of them. But one of them got retiled.
Q. Okay. And you said there were three bathrooms in the house; correct?
A. Yes.
Q. Okay. What about the kitchen, did you do any work in the kitchen?
A. I added a Venetian plaster into the back wall of the kitchen.
Q. I'm sorry. Into the what?
A. The back wall of the kitchen. I had it like resurfaced with Venetian plaster.
Q. Okay. Anything else? Did you add new appliances in the kitchen?
A. Yes. But they're my appliances, yes.
Q. Okay. What did you add?
A. So like the -- I bought the refrigerator, the coffee maker, the microwave and the oven, the dishwasher.


PLAINTIFF'S EXHIBIT PL103-025

Q. Did you add a new sink?
A. No. That was like -- that was not.
Q. Did you renew the flooring in the kitchen?
A. It's part of the epoxy flooring. The house is the same flooring.
Q. Is there like an island in the kitchen? Did you do any work on the island?
A. It got resurfaced, yeah, like, but it came out messy. But yeah, it was resurfaced.
Q. Okay. So how long did the entire project take?
A. So basically, what I had been doing is since my ex -- I want to say like my ex did most of it in terms of like -- like doing the big work, and I also had other contractors. But it had always been done by little by little, you know, because of money. And so I want to say the last time that I had here somebody working -- my guess. I hope I'm not forgetting -- it might be like last year -- okay? -- when -- yeah, like in March of this year probably when somebody --
Q. Okay.
A. Yeah.
Q. So it took approximately from September of 2022 to about March of this year?
A. Yeah.
Q. Okay.

A. I also had new patio door installed. I mean replaced with a new one, I guess.
Q. Patio doors?
A. Yeah.
Q. Okay. So were all of these work -- were they performed by licensed contractors?
A. The ones that were supposed to. Like, for example, the door, patio doors.
Q. Uh-huh.
A. What else? I mean, the guy who did the floor, he was licensed too, but it got destroyed on July 4th.
Q. Okay. So it sounds like from the time you purchased -- well, not purchased -- well, yeah, from the time you purchased to approximately March or so of this year, there's been a lot of construction activity going on at the house; is that a fair statement?
A. No. I mean --
Q. Okay.
A. -- I want to say that not a lot of construction activity because a lot of the things, for example, I have done myself, you know, especially whatever didn't require -- I knew the big thing would have been -- and I would have loved to go through for what I applied a permit for.
Q. Uh-huh.

A. But other than that, you know, like when my ex was here, he was, you know, constantly daily working on something here, but then he left. But since I live here, so I do things daily. But like, for example, I was painting. Like, you know, my hands are white right now as you can see (indicating). I was painting the trims like last night, so I also do something. But yeah, the house was --

Q. Okay.

A. Sorry.

Q. No. Go ahead.

A. No. I said but the house to me -- like probably because I have been living here for now over two years or two years -- it almost feels like the same. But I mean, I don't know if somebody would walk in here and say like, "Oh, my gosh. What a change." Well, the sunken would be one. The sunken was performed by a licensed person too.

Q. Okay. So I actually want to talk about the sunken floors. So does that actually mean like the floor is like below ground?

A. Yes.

Q. What do you mean by sunken floor?

A. Should I turn the computer and let you see it?

Q. Well, can you just describe it? Because again, that's not going to show on the transcript, so if you can


PLAINTIFF'S EXHIBIT PL103-028

describe it in your best way you can.
A. In the middle of the living room, there is like a sitting area that basically you just go one, two steps down. And it's a square of approximately 10 feet by 10 feet. But I inquired to the City prior to this -- right? -- and then they said like, you know, anything that is flooring, you don't have to get permits even if it's building a sunken.
Q. Okay.
A. And when I gave them the plans of like the permit that I wanted, also the architect didn't do the sunken, and I was asking him like, "Hey, are you missing this out?" And he said, "Oh, no. That's not something that gets included in the plan normally."
Q. Okay. So it's like a 10-by-10 square in the middle of the living room you said?
A. Yes, sir.
Q. And you actually have to step down from the floor?
A. Yeah.
Q. Okay. And so when you get into that lower level, for lack of a better word, what is there? Is it like a --
A. It's a sitting area.
Q. Sitting area? Okay.

A. Yeah. If you would like -- I don't have a picture. Yeah. Sitting area.
Q. Okay.
A. And then it has sort of like around the edges like, you know, it comes high a little bit just in case for -- like, you know, for safety, so you don't trip or something like, you know, as it was required to do.
Q. Okay. So that's something that you did to the house after you purchased it; correct?
A. Yeah.
Q. So you literally had contractors come in and dig a hole in the middle of the floor?
A. After my -- when Julio Sanchez like removed all -- there was like vinyl, carpet, like all kinds of like different floorings right here, so he basically left the house with like a pile of cement, like brick and cement. And then -- so yeah, then that was basically already there. Like, you know, the living room is big, so somebody came and like dug the hole. Yeah.
Q. Okay.
A. I'm sorry.
Q. No. That's okay.
Again, that's something that you did to the house? It wasn't there when you purchased it; right? That's something that you added on as a feature to the


PLAINTIFF'S EXHIBIT PL103-030

house?
A. Yes.
Q. Okay. And so that was done -- you said Mr. Sanchez removed the floor. Okay. And then you added the patio doors you said?
A. I had them replaced.
Q. Replaced. Okay.
Is that something new that you added or was that also a feature that was also a part of the house when you purchased it?
A. They were part of the house, but they were really old.
Q. So you didn't have to like demo a wall to add these patio doors or anything like that?
A. No.
Q. You need to verbalize your response.
A. Oh. I said "no." I'm sorry. Maybe I was frozen or, I'm sorry, I wasn't loud enough. Yeah.
Q. What about in the kitchen, did you do any demolition work in the kitchen?
A. No.
Q. Bathroom?
A. No.
Q. And then in the kitchen, you said earlier you added some kind of flooring. I mean some kind of wall, a

Venetian plaster.

A. I resurfaced the back wall.

Q. Okay. Can you describe what exactly you did? I mean, I'm not exactly sure what that means, so could you like describe it to a layman?

A. So basically, like the existing wall that it had in the back, the surface, meaning like you got to sand it down, and then somebody came to plaster, then added the plaster, and then that was it. So now it looks like Venetian plaster.

Q. Okay. So did you have to like remove appliances and cabinets in order to get to that back wall or what was the process?

A. So yeah, like it had -- like it had an older refrigerator, but then I bought one. That was the only sort of like reframing of that area. Like it has to be smaller I think because it was bigger, so yeah.

Q. Did you have to remove any cabinets?

A. No. Didn't have cabinets.

Q. Okay. And then you resurfaced and you sanded it down and then you put the plaster?

A. Yes.

Q. Okay. What about the kitchen island, the same process?

A. The resurfacing, same thing, yeah. It got

sanded down. There was an older cabinet right there that got removed, and then I just added like this long door, I guess.

Q. Okay. And then the appliance in the kitchen that you added or replaced, is that something that you did or did you hire a contractor to do that?

A. To replace? Okay. So I bought them, and then the person that did the Venetian plaster is the one that did the smaller frame, so that, you know, by installing it -- I mean, my ex did it, because nothing like got changed. Basically, like the electric, everything, it was just to like plug it in.

Q. Okay. You said the framing for the appliances was done by the plasterer?

A. Yes.

Q. Okay.

A. And he's licensed.

Q. Okay. And then going back to your earlier testimony. You were talking about having a different property or another property. Do you recall that part of your testimony?

A. Yes.

Q. Okay. What property are you talking about?

A. Do you mean you're asking me for the address or --

Q. Yes. Well, sure. Yeah.
A. Okay. Because I have three other properties.
Q. Okay.
A. But that one the one that I was talking about was my primary home. That address is 19525 Schoolcraft. School like high school and craft, but one word, Schoolcraft Street.
Q. Okay.
A. The city is Reseda and the zip code is 91335.
Q. Okay. You said you had three other properties?
A. Yes.
Q. So lets just get the address for the other two properties right now.
A. 13236 Klein, K-l-e-i-n, Court in Sylmar, California 91342.
And the other one is 6540 Hayvenhurst. That's H-a-y-v-e-n-h-u-r-s-t, Avenue, Unit 22. The city is Lake Balboa, California 91406.
Q. Okay. Any other properties?
A. No. Just four.
Q. So you have four properties total?
A. Yes.
Q. Okay. Are you the owner of all four properties, you yourself?
A. Yes, sir.


PLAINTIFF'S EXHIBIT PL103-034

Q. Anyone else on title other than you?
A. Just me.
Q. Okay. So very quickly, I kind of just want to go over the other properties. So the property in Reseda, is that a house?
A. Yes.
Q. Okay. And when did you purchase this property?
A. April 2018.
Q. And you said that was your main residence?
A. From the time that I bought it until September 2023.
Q. September '23.
And what happened in September 23 that this property was no longer your main residence?
A. I rented it out.
Q. Okay. So before then, were you living there?
A. Yes.
Q. Okay. And then in September of '23, you rented it out. Is it still rented out?
A. I kicked out all the tenants, I want to say, two months ago because I put the house for sale, and they recommended that it would be empty better. So it's furnished, empty, and I might be moving back on October 4th.
Q. Okay. So it's listed for sale right now?


PLAINTIFF'S EXHIBIT PL103-035

A. Yes.
Q. How long has it been listed? Two months?
A. More. Approximately -- I'm not too sure, but I want to say maybe since April.
Q. Okay. Of this year?
A. This year. Yeah.
Q. Okay.
A. Same thing with this house.
Q. Which house?
A. Palm Springs.
Q. Oh. That's listed for sale too?
A. Yeah. And the contract was over today with that agent, and I noticed that this morning that he removed the listing. And I was already talking to a realtor that I'm going to meet next week so he can put it back on sale.
Q. Okay. So sticking with the Palm Springs property. When did you list that property for sale?
A. Must have been same time. Around April or May of this year.
Q. Okay. And you said the contract just ended today, but you're going to get a new realtor?
A. Yeah.
Q. Okay. And what is the listing price for the Palm Springs property?


PLAINTIFF'S EXHIBIT PL103-036

A. Right now, it is -- can I -- I'm not too sure. I think it's 1.699. I think so. 1.6 -- $1,699,000.

Q. Okay. What about the Reseda property, what's the listing for that?

A. This is my third time decreasing it at 888,000 is the asking price today.

Q. Okay. And then you said you had a property in Sylmar?

A. That property was also listed, but because I have tenant -- in March or April of this year approximately. But because the tenants were sort of like cooperating with like bringing potential new buyers, but not keeping the house really clean, so it wasn't giving a good impression. And given that I had like -- it was like a lot for me to deal with like so many houses and issues and all of that for sale, so I had it removed, I want to say, approximately a month and a half ago. And I told my agent that once he sells Reseda, then we'll move forward to selling back Sylmar.

Q. Okay. So Sylmar, I take it, is a rental property?

A. Yes.

Q. Have you ever lived there?

A. No.

Q. Okay. Is it a house or a condo, a townhouse?

A. A townhouse.
Q. Townhouse.
So currently, you're renting it out right now to tenants?
A. Yeah.
Q. And when did you purchase that property?
A. Around December 2020. Oh, I'm sorry. Around December 2021.
Q. Okay.
A. Oh, my gosh. I apologize. Around December 2020. I'm sorry.
Q. That's okay.
A. Yeah.
Q. No problem.
A. Thank you.
Q. Okay. December 2020. And since you purchased it, you've always used that as a rental property?
A. It was purchased as a commercial property.
Q. Okay. And then the other property is in Lake Balboa?
A. Yes.
Q. Is that a house or a --
A. Townhouse.
Q. -- condo? Townhouse. Okay.
And when did you purchase this property?


PLAINTIFF'S EXHIBIT PL103-038

A. Approximately March 2013.
Q. And was this also a rental property?
A. It was my primary home up until April 2018 when I bought Reseda.
Q. Okay. And then since then, you've rented it out?
A. Yes.
Q. Is it currently rented?
A. Yes.
Q. Is this property also listed for sale?
A. No.
Q. Okay. And Sylmar is currently not listed either; correct?
A. Correct.
Q. Okay. So with respect to the four properties, just very quickly, on the Palm Springs property, what is the monthly mortgage?
A. Approximately 5600.
Q. And are you current?
A. No.
Q. How far behind are you?
A. So maybe like, I want to say, 11 months.
Q. Are you like in the process of working out some kind of an arrangement with the bank?
A. Yeah. Excuse me for one second.

Q. Sure. I forgot to mention, Julio, if you need to take a break, just let me know and we can take a break at any time.
A. And I know we're not physically present. I had to like light up a cigarette. I apologize if that looks bad.
Q. No. It's your house. You can do whatever you want, so don't worry about me.
Okay. And then the property in Reseda, what is the mortgage there?
A. 2200 approximately.
Q. Are you current on this property?
A. No.
Q. How far behind are you on this property?
A. The same.
Q. 11 months?
A. Yeah.
Q. Okay. And are you also trying to modify this mortgage as well?
A. Yes.
Q. What about the Sylmar property, what's the mortgage there?
A. 2400, approximately. And that one, the loss mitigation case worked out and effective -- it's modified and everything, so effective November 1st, I basically

start my new mortgage payment.
Q. So it's 2400, is that the new amount?
A. Yes.
Q. And the mortgage at the Lake Balboa property, how much is that?
A. Loss mitigation worked out. Effective October 1st, the monthly payment will be 1100 approximately.
Q. Okay. So when you were leasing or renting out the Sylmar and the Lake Balboa property, how much were you earning in terms of monthly rental income?
A. From all of them or three of them?
Q. Well, okay. So that was a bad question. Let me rephrase that.
So the Palm Springs property, that was never rented out; correct?
A. No. However, I want to add that when I purchased this home, the seller had a condition that he wanted to stay here for a month after it got sold, and then at that time it was arranged that he had to pay $5,000 back to me.
Q. Okay.
A. So when I received those paperworks -- because I do everything, my taxes the right way. I have an LLC and I don't commingling things. When I received the final


PLAINTIFF'S EXHIBIT
PL103-041

paperwork for the house purchase, the 5,000 was listed there. And since it was going to be an Airbnb, I listed the house that year, taxes, this house, as part of my business, and I also reported the $5,000 of rent that year for this house.

Q. Okay.

A. So technically, I have received that. That was that, but nothing else.

Q. Okay. Thank you for that clarification.

I was asking more along the lines of after you purchased the property, you know, did you list the property out for rental to the general public, and then actually rent it out like you've done with the other properties?

A. No, I have not.

Q. Okay. And you've never used it as an Airbnb either; correct?

A. No. I was approved for the Airbnb permits and I received the certification, but I never got to do it.

Q. So then the Reseda property, after you moved out and started using that as a rental property, you know, what were you generating in terms of monthly income with that property?

A. 5200.

Q. So it approximately covered the mortgage?

A. Oh, yeah. Yes.
Q. What about the Sylmar property?
A. Sylmar property today is giving me 4250.
Q. And the Lake Balboa?
A. 4800.
Q. So as of right now with the loan mods on the property that you were able to obtain, it sounds like you were able to generate a positive income from the rental properties; is that correct?
A. That is correct. Yes.
Q. Okay.
A. Yeah.
Q. But it wasn't -- that wasn't always the case, it sounds like?
A. So when July 4th happened, that's when my life like -- I like, you know, was raped and my ex and I went down into this like mental like health issue and basically I lost power and willingness and I just -- it got overwhelming.
Q. Uh-huh.
A. And I stopped basically answering calls or like, you know, like being responsible in taking care of them because I just couldn't. And that's when things -- like, you know, Sylmar, for example, the tenants left and it remained unrented for like seven months.

Reseda had issues. Two tenants left -- three of the four rooms, two tenants left -- three tenants left, and I only had one tenant for like a good time.

So like -- and it wasn't -- at that time, that's why it took me to all the loss mitigation cases with the banks so I can get up on my feet again.

Q. Okay. So compared to how you were back then that you just described and where you are now financially, would you say you're now in a better place financially than you were?

A. Yes. My net worth is over $2 million today. The only thing is that dealing -- like moving away from my family and friends to Palm Springs, and I'm here by myself, it's made it really challenging for me to manage those properties because I always have to find somebody who wants to rip me off or take advantage of.

And so, yes, I am now better financially, but my plan is or had always been to put all the properties for sale. If one property in L.A. sells, then I will focus on selling the other two and then I just stay here. But if this property happens to sell first, then I move back to L.A. and then I will keep my properties because it will be easier for me to manage like the way I used to do it before.

Q. Okay.


PLAINTIFF'S EXHIBIT
PL103-044

A. However, my dog, he had an issue with like his leg -- like one of his legs shrinking up, and he had an MRI, and he has a tumor, so it's going to happen to all of his four legs, so I decided to move back to L.A.

Q. Sorry.

A. I just cannot be here anymore. And that way I will have the support of my friends who are around me. And so, yeah, I'm planning on really like this property's listing price, to bring it down even lower to 1.499 and just sell it as quick as possible and just keep L.A. properties.

Q. Okay. You mentioned that LLC earlier. Is that the LLC that's listed as the name on your screen right now?

A. Yeah. Mea Luna LLC, yes.

Q. And that's M-e-a L-u-n-a, Mea Luna?

A. Yeah.

Q. Is that one word or two words?

A. Two words. It's Mea space Luna.

Q. And what is Mea Luna LLC? What is that?

A. It's the company I created to deal with my rental properties, so in that way, I will keep my liabilities protected, I guess.

Q. You're obviously a member of the LLC?

A. Sole member.


PLAINTIFF'S EXHIBIT PL103-045

Q. Okay. And was that set up here in California?
A. Yes.
Q. And do you remember when approximately that was set up or when the articles were filed?
A. I want to say approximately in 2020.
Q. Okay. And you said the purpose of that was to protect yourself from liability for your rental properties?
A. Yes.
Q. Okay. So is Mea Luna the entity that -- scratch that.
But Mea Luna is not on title to the properties; correct?
A. That's the challenging part, like it couldn't because it will have to be refinanced under Mea Luna, but Mea Luna wouldn't have enough credit as I had it before.
Q. Uh-huh.
A. So what I have been able to separate my personal expenses and my business. I also keep the books. I used to at least, so that way I file my taxes under the business. Not federally, because it's a sole member LLC, which the government, the federal government, doesn't care about it. But for California, I do my taxes for the property. So yeah, like I mean, but the property's under my name.


PLAINTIFF'S EXHIBIT PL103-046

Q. Okay. So then when tenants -- you know, they rent a property from you, I assume that there is a rental agreement?
A. Yes.
Q. Okay. Is Mea Luna the entity on the rental agreement?
A. Yes.
Q. Okay. So Mea Luna essentially just manages the properties?
A. Yeah.
Q. Okay. Does it have a separate office and a staff or is it just in name only?
A. No. I'm the only staff like.
Q. Okay. So it's just name only; correct?
A. Did you say name only?
Q. Yes. In other words, there's no separate office for Mea Luna with its own employees and staff?
A. Well, when I have -- my taxes -- taxes wise, like that's how -- I have had employees.
Q. Okay.
A. Like contractors -- right? -- and I list them and I book them that way, so yeah. Like --
Q. Okay.
A. -- I also have an office space in my house for it. According to my taxes, that's how I filed it.

Q. Okay.
A. Because where I live is my business and it's my office too and that's legally right and I did it that way.
Q. Okay. Fair enough.
So is managing -- scratch that.
Is deriving income from your rental properties your sole source of income?
A. No.
Q. Okay. Are you currently employed?
A. Yes.
Q. Okay. And what line of work are you in?
A. Banking.
Q. And who is your employer?
A. Bank of America.
Q. And what do you do for Bank of America?
A. I work at the private sector as a tester.
Q. Tester?
A. Tester, so audit.
Q. Okay. And how long have you had that position?
A. Since March 2020.
Q. Is that in Palm Springs?
A. Well, I work from home.
Q. Okay. Gotcha.
A. Yes.

Q. All right. So other than your job as a tester for Bank of America and the rental income, any other source of income for you?

A. No.

Q. No?

A. No. No other source of income.

Q. Okay. We've been going about an hour does anyone need a break or can we go forward?

A. We can go forward if it's up to me.

Q. Okay. So I want to move on and quickly go over a letter that I had sent to you.

MR. NA: This will be entered as Exhibit A or Exhibit 1, I should say, to your transcript.

(Exhibit 1, remotely introduced and provided electronically to the reporter)

BY MR. NA:

Q. And if I did that right, you should see on your screen a copy of my September 12th, 2024 letter.

Can you see that, Julio?

A. Yes.

Q. Okay. Do you need me to enlarge it?

A. Only if you want me to read a specific part.

Q. Okay. So again, this is going to be Exhibit 1 to your transcript. And I just want to actually focus on the last, I guess, two pages with respect to the Request

for Documents and Information that I had made. I just want to make sure that we got everything that we had requested from you as part of my client's investigation of this claim.

So the first request here -- and let me just -- the first request was copies of any documents, such as receipts, invoices, et cetera, which evidence the purchase of the items making up the claim. I know that you had submitted documents before I got involved directly to my client. I just wanted to make sure that you have, in fact, submitted all documents that are in your possession that are responsive to this request.

A. So when I saw first this letter that's in the email that I received that I responded to you guys --

Q. Uh-huh.

A. -- I don't know if it was you, perhaps your assistant or another person. And I asked that question, "Hey, by the way, a lot of these documents I have already submitted." And then in the email that I received the response, it said, "Basically what we need is the videos."

Q. Right. That was from me, yeah.

A. Okay. So I believed -- I assumed that everything else you had.

Q. Okay. So again, so then your response to


PLAINTIFF'S EXHIBIT
PL103-050

Number 1 here is that you have submitted all documents in your possession already that are responsive to this request?
A. Now that I'm reading it, so, for example, I would say if you're asking bank statements showing withdrawal of cash, if the items were purchased in cash, a lot of the items were purchased like long time -- oh, cash. No, I don't think I bought anything in cash.
Q. Okay.
A. But I haven't submitted any bank statements to Farmers or you. I know that.
Q. Okay. That's fine.
A. But receipts, yes.
Q. Okay. So again, the bank statements is just as an example; right? We're not saying that you have to send us bank statements. So it's any documents that would evidence your purchase.
A. Yes.
Q. So it sounds like you have submitted whatever you have in your possession already --
A. Yes.
Q. -- to my client?
A. Yes.
Q. Yes? Okay. Number 2, similarly, documents such as receipts, invoices, et cetera, which evidence the


PLAINTIFF'S EXHIBIT
PL103-051

shipping and delivery of the items making up the claim. To the extent that you have any documents that are responsive to that request, have you submitted all of those documents?

A. Yes. But keep in mind that there's a lot of items; right? You know, for every single item that was claimed, I submitted receipts. And then if there wasn't any receipts approved for explanation, or like an email, a reference of something about it.

Q. Okay. Perfect.

A. Yes.

Q. Request Number 3, documents such as appraisals valuations, reports, et cetera, which evidence the value of the items making up the claim. To the extent you had any appraisals done on any of these items and you have such documents in your possession, have you provided those to Farmers?

A. Yes. I don't mean this -- appraisals? I attempted, yeah. But I provided to Farmers the response that I received them. Yes.

Q. Number 4, documents which evidence the maintenance, service or repair of any of the items making up the claim to the extent, you know, any such repairs were done on any of the items and, you know, you've got documentation of such repairs.


PLAINTIFF'S EXHIBIT PL103-052

A. Not that I -- sorry.
Q. Go ahead.
A. Sorry. Not that I can think of right now.
Q. Okay.
A. There's never being a repair done on any of them.
Q. Okay. Number 5, documents which evidence your ownership of the items, such as manuals, warranty, registration forms. To the extent you have any of those documents, have you provided those?
A. Yes.
Q. Okay. The next page, Number 6, any photographs of the items making up the claim. To the extent that you have any photographs, have you provided those?
A. Yes.
Q. Okay. Number 7, any and all police reports filed by you in connection with the claim. And I do believe I received a copy of that from you, I think, last week or so.
A. Yes.
Q. So thank you for that.
Number 8, surveillance footage of the date of loss from your security cameras. And again, I received those from you, I think, it was last week. So thank you for that as well.

A. Yes.
Q. And then Number 9 is for any additional documents that are not specifically requested above but which you would like Farmers to review. Do you have any additional documents that you would like to submit for Farmers' review and consideration at this time?
A. Not at this time. I believe I have provided all. Unless you guys have further questions, I can provide more, but I don't have anything pending that I don't believe I have not provided.
Q. Okay. Perfect.
Moving on to the next document. If I have done this right, you should see a copy of the Proof of Loss that was submitted.
A. Yes.
MR. NA: And this will be entered as Exhibit 2 to your transcript.
(Exhibit 2, remotely introduced and provided electronically to the reporter)
BY MR. NA:
Q. Let me zoom out. I just want to quickly go over this document with you. So you do recognize this as your Proof of Loss; correct?
A. Yes.
Q. And all of these written entries or typed

entries, I should say, were done by you?
A. Yes.
Q. Okay. Did anyone assist you in preparing this Proof of Loss?
A. No. However, I requested assistance to Brian and the other agent. I had a bunch of questions, and they keep throwing the ball at each other, so I just told them that I would just do the best I can.
Q. Are you talking about the claims adjuster or --
A. Yeah. First, a guy named Donald Means was assigned. And then in the middle of like three weeks after, it got reassigned to somebody else. I think it's Brian Mejia. And right when the transition happened between them, I asked them both to like help me, and one didn't respond and the other one like also didn't acknowledge it.
Q. Okay. Other than that, in terms of actually completing this, this was done by you?
A. Yes.
Q. Okay. That's what I was getting at.
So on Page 1, no questions there.
In response to Number 6 on the Proof of Loss regarding your occupation, that is a correct statement of your occupation; correct?
A. Yes.


PLAINTIFF'S EXHIBIT PL103-055

Q. Okay. And then Number 7, cause of loss, theft and vandalism. That's correct; yes?
A. Yes.
Q. Okay. Number 8 regarding your description of the loss, if you would just quickly take a moment to read what you have written here. I just want to make sure that this is your accurate recollection of the loss.
A. Yeah. I actually read it right before joining the call, and it's accurate. Yeah.
Q. Okay. I just kind of want to go over this really quickly with you. So on June 3rd, you were running an errand to L.A. A guy name Robin stopped by. You told him you were going out to L.A. And so you left the property and got home around midnight, and that's when you discovered the loss; correct?
A. Yeah.
Q. Okay. Number 9, date and time loss was discovered. June 4th around 12:30 a.m.; is that correct?
A. Yes.
Q. Okay. The next page, moving on to Number 15, was anyone working on the premises prior to the loss. And then in response, you've got your name painting ceiling.
A. Yeah.
Q. You don't identify any of the contractors or the


PLAINTIFF'S EXHIBIT PL103-056

people that you had hired. Is there a reason?

A. Well, because they -- I mean, work has not been done by any contractor here in a very long time. And so then this is asking if there was a contractor here when this happened.

Q. So at the time of the loss, you were only painting the ceiling?

A. Yeah.

Q. Okay. Number 17 is asking for prior losses. You've identified two here. The first one, January 2024, also with Farmers. Was that also at the current property in Palm Springs?

A. Yes.

Q. Yes?

A. Yes.

Q. Okay. And then the July 2023, that's the one that we had discussed earlier; correct?

A. Yes.

Q. Okay. Number 20, damage to the premises. And you described four items, a window, electric panel, dishwasher and the toilet.

A. Yeah.

Q. And then the estimate for that is $12,422.

A. Yes.

Q. That's based on an estimate you obtained from


PLAINTIFF'S EXHIBIT
PL103-057

Kings Power?
A. Yes.
Q. In response to 23, building damages, 12,422; personal property, $26,730.61; for a total claimed amount of $39,152.61; is that still current and accurate?
A. Yes.
Q. Then the next page, that's your signature?
A. Yes.
Q. And the date of August 2nd, 2024, that's correct?
A. Yes.
Q. It's notarized.
And then the last page has your itemized list. Let me rotate this real quick. I mean, I don't want to go through all of these items. That's going to take a little bit more time than is necessary. I just want to go over a couple of these items.
So just generally, let me ask you this. With respect to those items for which you have invoices and receipts, obviously, you were referring to those when you filled this out; correct?
A. Yes.
Q. Okay. For any of the items that you do not have receipts, what was your process?
A. So my process was, for example, the gold chains,


PLAINTIFF'S EXHIBIT
PL103-058

like so I went and I provided a document. So for every single one of these items, I have provided a document reference and a value if I did not have them. And so the chains, I Googled 22 karat gold chain and it gave me a list of prices, and I selected the one in the middle and circled it, and then I explained I chose the one in the center for each one of them. So that's one that I can remember that I can think of.

Q. Okay. All right. So it was by the process of, for example, Googling and seeing what the values are of similar items?

A. Yes.

Q. Okay. The laptop here, it's already been replaced by Bank of America. Did they charge you to replace it?

A. No.

Q. And then a couple of Apple items here. You've got an Apple MacBook. Is that AirPod earpieces?

A. Yeah. I provided receipts for all of them.

Q. Okay. So are these earpieces different than the earbuds?

A. No. They're different, yes.

Q. Okay. They are different?

A. Yes.

Q. Okay. And then you've got the Apple watch. So


PLAINTIFF'S EXHIBIT PL103-059

typically with Apple, you know how you can set it so you can track and find your items? Were you able to do that with these Apple products?

A. So not on the earpieces. The laptop, I was not, because it appeared offline. And also like the same thing with the watch, the watch I didn't have it as part of my iCloud --

Q. Uh-huh.

A. -- because I hadn't worn it in a long time. It was just here sitting on the desk for months. But no, I wasn't able to locate. The laptop would be the only one.

Q. Okay. And does that say "wall controller"?

A. Yes.

Q. So there's two of them?

A. Yes.

Q. Is that like a light switch?

A. It's more like you connect it and you replace the light switch and you put it, but it has a screen and then it's all digital and like you can sync it.

Q. Okay. Gotcha.

Okay. And then going further down, "security camera"; is that what that says?

A. That one is the one that -- where it was captured, and then it got basically hammered or like tampered. I don't know. But it got destroyed. It's

still here, but I mean --
Q. So that was the one that was outside; correct?
A. Yes.
Q. Okay. And then dishwasher, light fixture. And then I think this is a painting; correct?
A. The painting of the thing. Yeah.
Q. Okay.
A. I do not have the receipt. I had contacted the artist, and then he responded saying like, "Yeah. Sure. Send me the" -- I was asking what the value is. And then he said, "Send me the pictures." And I sent it to him. And he didn't respond. And then I had basically three emails like two days, three days after like, you know, and he never responded like four attempts. So I provided a copy of those emails to you.
Q. Right. I saw those.
I also was going to ask you did he ever get back to you and tell you, you know, what the value of the painting is now?
A. No.
I remember -- I think I remember paying like 5,000 for it. This is a long time ago. But like I don't remember what card I used.
Q. Okay.
A. But it was a long time ago.


PLAINTIFF'S EXHIBIT PL103-061

Q. All right. So how did you get this value of $750? Is that something that you Googled or what was that basis?

A. When I walk into -- I was in New Orleans at the Mardi Gras, and I walk into this art gallery and then they had this painting. And I remember the person said that it will be 5,000. So I asked to negotiate the price down and then to give me a call later. And then she called me and said they couldn't bring it down. And I really liked it, and back then, I wanted to have an expensive painting -- right? -- and then I went and then I said -- she was about to roll it. And I told her, "No, no, no. I want it exactly the way it looks." Like, you know, like with the framing and everything. "So can you just ship it to me?" Because if you roll it, then I have to go home and then buy a frame, and at that point, I'm not going to do it.

And then she said, "Well, that's going to be expensive."

And I'm like, "I don't care. Just send it."

And they did, and that's why they charged me like 700-something for shipping of the painting.

Q. Okay. Is this price, the 5,750 --

A. It's for the shipping and the painting.

Q. So that's 5,000 for the painting and then 700 or

so for the shipping?
A. Yeah. That's what I paid. Like, you know, I'm not saying that's the value of it like, you know. I don't know. That's one of the questions that I have for them. But so I just --
Q. And you purchased it back in 2018?
A. Yeah.
Q. So do you remember how they shipped it to you?
A. You know, it came in a huge -- it looked like a mummy was being shipped to me. Like it was a big box. I mean, I will say UPS because that's commonly used for big shipments, but I don't recall.
Q. So they shipped it in the frame, is that --
A. Yeah.
Q. Okay. And you don't have any documentation of that purchase and the shipping?
A. I can -- I used to use different -- I do not have it.
Q. Okay.
A. I can try to locate it. That's why I contacted him to see if they have it since it was a unique painting. But, I mean, I don't know why he stopped respond.
Q. And when this was shipped, where was it shipped to?

A. To Reseda.
Q. And I imagine at some point, you moved it from Reseda to the Palm Springs property?
A. Yes.
Q. Okay. When you moved it to the Palm Springs property, where was it inside the Palm Springs property?
A. At the time, it was behind -- in the wall behind the dining table.
Q. Okay. How big is this painting, by the way?
A. It's pretty big. So let me see, approximately 7 feet wide -- no, no. 7 feet is too much. Maybe 4 feet wide and by 6 tall.
Q. Okay. And so you had it hanging on the wall behind the dining room table you said?
A. Yeah.
Q. Okay. And that's where it was at the time of the loss?
A. Yes.
Q. Okay. When you had it in the -- scratch that.
When you received it at the Reseda property, did you have it hanging in the Reseda property?
A. Yeah. Even when I moved in here. Because I rented the house -- I rented the properties furnished, I left that painting in there with the new tenants for awhile. But then I moved it here maybe a year ago.


PLAINTIFF'S EXHIBIT PL103-064

Q. Okay. So a year ago from today. So do you think you moved it to Palm Springs around September of 2023?

A. Yes. And the reason why I am saying a year ago is because I remember last year when I had the examination under oath for Farmers --

Q. Uh-huh.

A. -- around October, I remember I was sitting at this desk and the painting was behind, so I know for sure it was here.

Q. Okay. So then after you moved it to the Palm Springs location or the Palm Springs property, was it always in the same place, behind the dining room table in the dining room?

A. No. Before this desk, it used to be in the other corner of the living room. So it used to be on that wall. Then I had it in the master bedroom once. Yeah. It's been in different places.

Q. Okay.

A. But under the mattress too at the beginning.

Q. So let me ask you this. You said at the time of the loss, it was on the wall behind the dining room table. So when was it moved to that location?

A. I don't recall. I want to say it had been months. I don't -- it would have to be months.


PLAINTIFF'S EXHIBIT PL103-065

Q. Okay.
A. Like two, three months at least. I don't -- that's an estimate. That's a guess.
Q. I think you just testified right now that in your EUO back in October 2023, you were sitting at that table where you are now and the painting was behind you. So at least as far back as October of 2023, the painting was on that wall behind the dining room table?
A. What I mentioned was that, but this desk was in the other corner of the living room. This desk, like when you enter the house, you see the living room; right? Now the desk is located on the far right hand. But a year ago, this desk was located on the far left hand of the living room.
Q. Okay. Are we talking about your desk or your dining room table?
A. The desk.
Q. Okay. So was the painting behind the desk or behind the dining room table?
A. The painting back then was behind the desk on the wall behind the desk.
Q. Okay. But at the time of the loss, you said it was behind the dining room table; right?
A. Yes.
Q. Okay. So I just want to focus on that.

So when it was moved to the location behind the dining room table, do you remember when that was?
A. That's what I don't remember exactly. I want to say a couple of months. I don't -- I don't recall.
Q. Okay. A couple of months before the June 4th loss; is that what you're saying?
A. Yeah.
Q. Okay.
A. I'm not -- I don't --
Q. Well, let me see if I can refresh your recollection. Do you remember any particular reason why you would have moved that painting from wherever it was to that location?
A. Yeah. So basically, when I looked at the other wall, it has the entrance of the hallway in the middle. So having one painting only, it sort of left this other wall empty and I just didn't -- it didn't seem right on that wall.
Q. Okay.
A. So in here, this basically -- this wall was naked. And then I thought, you know, this would be a good space to like fill in the wall and then it looks a little bit more centered. But I always knew that that was not going to be the end because that painting doesn't scream out Palm Springs, like which is more like a


PLAINTIFF'S EXHIBIT PL103-067

temporary modern. The painting doesn't. I always thought it didn't belong in this house, like I had to find a place for -- to put it. But it was there to like basically fill in the wall.

Q. Okay. That's great.

So then having said that, can you approximate more closely the timeline as to when you may have moved that painting to fit the description of the artwork that you just gave us?

A. I'm sorry. Was that a question or --

Q. Yeah. So you seem to remember the reason why you moved the painting.

A. Yeah.

Q. So I'm asking does that now kind of trigger in your memory, you know, an approximate timeline or date as to which you may have moved that painting on that wall behind the dining room table?

A. No. Because it wasn't like -- like for awhile, I also had it here and then I would move it -- there's a bedroom right here, and then I would move it under the mattress. Like if I felt somebody was going to come and I didn't trust them, then I would leave it there for awhile. And then I would bring it also to behind the laundry, the washing machine, because I knew it was expensive, and I mean, when people here had stolen from

me in the past, so I always -- yeah. I moved it a lot.
Q. Okay. Well, will let me ask you this. So the loss here was in June of 2024. You said you moved the painting to the wall behind the dining room table a couple of months before then.
So let's go to Easter. Do you think you did it before or after Easter in 2024?
A. I don't even know when Easter is.
Q. Let's go to Valentine's Day. Do you think you did it before or after Valentine's Day?
A. Like I don't recall. Like, you know, I don't know. Like, yeah. I mean, because the painting, I -- staying in this house like without my friends and family, like I move things here a lot. Like, you know, I redo them and redo them and redo them. You know, constantly like changing things, you know. That's why -- like I move things a lot, so I don't know. I don't remember. It could have been there in February and then I moved it to the other room and then I moved it back, like, you know. Yeah.
Q. Okay. All right. Let's move on here.
The Proof of Loss, it looks like you've got a window here. Can you describe the window? What was wrong with the window?
A. So my understanding is -- so when I left the

house, I locked everything. What it seems is that they probably jump up one of the two side patio gate. And when I came back to the house the next day when the police was here, I was outside again, but it was daytime. And what I noticed is that they had brought something from the shelf to right outside that window, and then it was just there -- like sort of like it worked as a step. And then also the framing outside of the exterior wall around the window, the bottom part of the frame, it had been chipped out. Like the metal part, it had been -- it had a rectangular hole, like 2 inches by 1 inch. And that's what I figured. And then the hammer and another thing was down there too still, so that's what I figured, oh, this is how they entered the house. But yeah, the framing of the window is still like that right now. It was chipped out.

Q. Okay. Was the window broken? Was it smashed?

A. That portion, like I don't know, there is -- it looks like some mechanics happened inside of the window. I don't know. But it was open, the framing part -- the metal part of the window was open at the bottom. And then you can see some sort of like -- like metal sticks. Like I don't know what happens when you close the window. And that's how it gets locked or whatnot, but it looks like they knew something what to do, and that's how they


PLAINTIFF'S EXHIBIT PL103-070

got it open.

Q. Again, was the window broken? Was the glass shattered, smashed?

A. Oh, no. It was opened.

Q. Was it no longer opening and closing?

A. It is opening and closing, but now, I have -- like when you -- when you close the window -- I'm sorry. When you open the window, it goes through the other half in the rail. So right now, I have like a stick right there, so even if it's unlocked or something, you cannot open it. But it still locks and unlock.

Q. Okay. And you said the house is currently listed, right, for sale?

A. Yes.

Q. I know the contract expired today, but it was listed for sale after the loss; correct?

A. And before the loss.

Q. Oh. Even before?

So the question that I had was so, you know, with respect to all of the property damage that's part of this claim, did you make those repairs before listing it?

A. What repairs?

Q. Well, so if you go to the Proof of Loss here, earlier remember we went over --

A. Yes.


PLAINTIFF'S EXHIBIT PL103-071

Q. -- Number 20, the window, the electric panel, dishwasher, the toilet? So were these items, were they replaced before you listed the property again after the loss?
A. But like when my ex was here --
Q. No, no, no. I'm asking about right now. All right?
A. Oh.
Q. So this loss occurred in June of 2024. So after this loss occurred with all of the damage that you're claiming, when you listed the house for sale, did you replace those items or did you list the house without replacing them?
A. I have listed the house, and I'm thinking like if -- to me, it's like I just want to sell one property. Like if this house, if somebody's interested, I will get those fixed like with the rent money. So I have not taken care of any -- I have not fixed anything.
Q. Okay. So you haven't fixed anything, but you listed the house for 1.6?
A. Yeah. No, I have not fixed anything.
Q. Okay. Going back to this list. This third item from the bottom, I'm sorry, I can't read your handwriting. What does that say?
A. Oh. It's "No-Face anime memorabilia." It's a

memorabilia. No-Face is an animation character from Japan, and I got it in Tokyo at this store.

Q. Okay. What is that? Is it -- can you describe this item?

A. Yeah. So No-Face is an anime character. So Japan has this little kid -- stories about this little kid who goes around with the goats. And then like what this item was -- but it's very popular, and I didn't know about it, but I liked it. And when I went to Tokyo, because there was a store for it. And then it was the kid sitting down in this like glass capsule and sort of like reading a book and this like park bench. And the ghost was like next to him, look ugly, but he was sort of like watching down and take care of him.

And when I was looking at it, somebody there told me about the story, and then I decided to purchase it. And I had it here, and then it turns out that everybody knew about it except me, but I really liked that piece. But apparently, later, I learned that it's called No-Face, but --

Q. Okay. But, again, this particular item is a painting?

A. It's a figurine like in a capsule made of glass, and then it's like -- it's a figurine, but yeah. I don't know how to describe it.

Q. Okay. So it's a figurine that you purchased from Japan. And the $1,500, is that the value you paid for it or what's it worth now?

A. I don't remember. Because, I mean, it was a lot of money in yen. I don't remember how much because I bought a lot of things. I kind of -- I searched the price, and I believe that's what I provided to you guys in reference to it.

Q. Okay. So you provided documentation for this item?

A. Yes.

Q. Okay. And then the next item, what does that say?

A. "Snow globes."

Q. Snow globes?

A. Yeah. Those are the -- prior to moving in here, I traveled to 49 countries, and every time I traveled, I will bring something from there. You know, something like artsy, I guess. And I had these like -- I had snow globes, but also other figurines. That was all part of on that glass shelf, and he took everything out.

Q. Okay. And then the last item is a toilet. And that's the toilet in one of your bathrooms. I think I saw a picture of it. But can you describe what the damage to the toilet is or was?

A. So on the window that he entered through, it's the guest bathroom of the house. I am assuming that if he climbed it -- well, on the other date when I flushed the toilet, it started like pouring out just water like, you know? And then -- that was the day after. And then I opened it, and then I saw this like black substance like. And it's still there, you know. It wasn't anything dirty, you know. It was like something, you know, sitting there. And I figured that's what clogged it. And I assume that since he climbed it, they climbed through it, like they had to step to the toilet, something happened. I don't know what happened, but it was to the extent that the toilet does not work.
Q. Is the toilet -- is it cracked? Is it broken?
A. No. It's like it doesn't -- there's something stuck inside.
Q. It's still stuck? You can't unclog it?
A. Well, like somebody has to like come and unflush it or do something. I don't know. I haven't done anything to it either.
Q. Well, so again, I'm just wondering why does it have to be replaced if it's just clogged?
A. Oh, well, that's just my assessment. Like, you know, when the guy from Kings Power was here, he also didn't -- I mean, that's what contractors do. You know,


PLAINTIFF'S EXHIBIT PL103-075

they rather work on like replacing something new instead like fixing something existent. And that was sort of like -- but I know, I will admit, like he didn't, "Definitely, you have to buy a new one and this is how much we'll charge you." And that's why I wrote this down. But if somebody can replace it, by all means, I will take that.

Q. But I mean, the question that I have is is it damaged to the point where, you know, it's got a crack on it? It's broken or --

A. I don't know. It's not cracked. It's not broken. But I don't know if whatever substance it had, it damaged anything inside. I'm not that expert or I don't know.

Q. Okay. So I want to go over just very quickly, if you could mentally go back to the date of the loss and kind of describe for me, you know, what happened that day and how the loss was discovered. I think it would be faster if you just kind of provided me with a summary as opposed to me asking you questions right now. So if you don't mind just providing a summary of what happened that day.

A. Okay. So this is when I was selling Reseda, and then it was listed for sale already, but we were having issues with the tenants also not keeping the place up to

par. So my realtor told me that it would be better to empty out the house. So that's when -- and then he kept coming back with complaints like, you know, oh, the kitchen is dirty or this smells or whatever, so I decided then that it was time for me to go address it. Clean it or whatnot.

So I don't like driving especially long distances, so I asked this friend of mine if he could drive me, and then he said yes. His name is Edward. So at the time he asked me to send him an Uber. So I did go and I submitted the Uber to get him where he was to get him here.

I was in my living room. I don't remember if I was resurfacing the dining table. I was adding a new -- like fixing the cement part to make it smooth.

And then like I had left the garage door open thinking that -- I assumed he was going to be here in 10 minutes; right? And then I hear somebody like knocking on the garage. And I was like, "Hey," I thought it was him. And I said "Come in." And that ended up being Robin.

And Robin is somebody that I had met a month before who was looking for anything -- any work. And he came and worked here, like going and running errands for me, until one day, he stole a hundred bucks and he went

to the casino and wasted it, so I let him go and I was upset.

But then when I saw him this time, and he walked in, I was like, "What are you doing here?"

He said, "I want to introduce you to a friend."

And then I was like, "Well, I have to go to L.A."

And then this other guy was like coming right behind him, and then this guy was like, "Oh, you have a beautiful home."

And then I was like okay. So I was trying to get them out of here. I told them, "I really have to go."

He asked me, "What are you going to do?"

And I was like, "I'm just" -- I told him what I was going to do like in L.A. I had to like basically go clean the house and this friend is coming.

This happened really quick. He said, "Could I give you my phone number so we can chat later?"

So I was like, "Sure." We exchanged phone numbers. He introduced himself as Garrett.

And so at this time, I see the Uber pulling in front of my house, and then they both left.

So then Edward comes in and he helped me finish packing my SUV. So I left my dog here. I said "Bye."

And then we started driving to L.A. I want to say this all happened like at 11:50 a.m. when Robin came in and the Uber and all of that. We probably left at 12:00 p.m.

I removed a bunch of lights. He helped me clean the patio in the house and like repair like a lot of minor details, like painting a wall here and there. And then we ended up like leaving, I want to say, like around 8:30 p.m.

When we came, we stopped over to have dinner. And then we went to where he's staying. And then -- the car was loaded with things. There was a kick box -- something like a punching bag that a tenant had, so he asked me if he could keep it, and I said yes.

So he started unloading what he asked me to keep. And then I started driving alone home. So he was in Desert Hot Springs. The drive from here to there is like 20 minutes.

When I got home, I noticed that like the entire house seemed off, like turned off, like, you know, like no power. But it was kind of weird, but, again, all the houses in Palm Springs are really dim, low.

So I opened the garage and then I came in. And when I walk into the living room, I noticed my dog, he seemed scared. But he's a chihuahua. They usually are scared. And I couldn't like turn on any lights.


PLAINTIFF'S EXHIBIT
PL103-079

And so I go outside then, and then I noticed that the switch like of the main panel had been turned off and it looked like it had been -- like the panel wall was on the floor, so I thought it maybe just fell off. It was windy or whatnot.

So I turned it back on and was thinking that it was strange. I thought like maybe I am the one who turned it off and I forgot to like turn it back on. My mind is not a lot present since all of this happened, so it's -- I was trying to remember.

And then I walk inside the living room, and then I was just like standing in the kitchen island, and I was just thinking like did somebody break in? I don't think so because I mean, in my head, I was just like, yeah, things are still here.

And then I thought like, well, if somebody came and broke in, they would have stolen my work laptop. And then right there from where I'm standing, I like looked over on my desk, and I don't see the laptop, so I freaked out a little bit.

And then I'm like let me see if it's in the master bedroom. I went and didn't find it. And I came back and where did I put it? And then I looked over at the wall, and that's when I realized the painting wasn't here. And that was the moment I was like holy cow. I


PLAINTIFF'S EXHIBIT PL103-080

mean, I know that I left it there and, you know, it's not there.

So then I first called Corporate Security from Bank of America, and that took awhile because it was already past midnight, and they had to transfer me to -- I spoke to up to three departments.

And then I called the cops, and the cops basically sent somebody nine hours after. And then what I did is I started like going through things and then making an inventory of what was missing, and that was that.

And then having access to the cameras was hard because I had an email from Spectrum saying that there was an outage in my area that day. And then like, you know -- and then I thought that me not having access to the camera was because I -- that there was no internet.

But then like when the cops came in, the service was restored, and that's when I saw the camera footage of these two guys, and then I saw the bucket on the kitchen, on the bathroom window, and that was that.

Q. Okay. Thank you so much for that. So I just want to kind of go over what you said and a couple of follow-up questions.

MR. NA: But before we do that, we've been going two hours. This might be a good time to take a short


PLAINTIFF'S EXHIBIT PL103-081

break or are we good to go forward?
THE WITNESS: A break is fine.
MR. NA: Okay. Why don't we take a -- it's 11:50. Why don't we take a 10-minute break.
THE WITNESS: Okay. Thank you.
MR. NA: Uh-huh.
(Recess)
BY MR. NA:
Q. Julio, do you understand you're still under oath?
A. Yes.
Q. Great.
Okay. So I think when we left off, you had just described the events of the loss and your discovery of the loss. I just want to follow up on a couple of things that you had said; okay?
So you said that you were asking your friend Edward to drive you to the property in Reseda. What is Edward's lasts name?
A. I think it's Greener. It's not like a close friend of mine.
Q. And the reason that you contacted Edward is because you don't like to drive, you said?
A. Yeah. I rarely -- back then, I had four cars. I rarely drive anywhere. I have gotten less attracted

towards it. I don't drive at all. I hate driving. I'm finding somebody to drive me.

Q. Why did you have to send an Uber to Edward's? Doesn't he have his own car?

A. No, he doesn't have his own car.

Q. He doesn't mind driving even though he doesn't have his own car?

A. He's poor. I mean, if he could have a car, I think he would. I mean, if he could afford one, I think he will buy one, but he doesn't have one because he cannot afford one. I don't know, but yeah.

Q. And how do you know Edward?

A. We met through a dating app.

Q. I'm sorry?

A. We met through a dating app.

Q. Okay. Is he like an ex-boyfriend?

A. No. Somebody that I was with once before and we remained acquaintances. Like, I mean, it's that, if anything. But also like he had helped me in the past with like little things, like, you know, that I had to move things or like, you know, plants or whatever. And then like, yeah, like do some shopping for me and then he goes -- yeah.

Q. Is he a contractor?

A. No. No, he's not.

Q. Does he work? Does he have a job?
A. I don't think he does. He's always saying that he's looking, but, I mean, I don't know.
Q. Okay. All right. Okay. So you said you left the garage door open?
A. When I send the Uber and I saw that it was like about 10 minutes or so from here, so I left the garage door open.
Q. Okay. So I wanted to clarify. When you say "garage door," are we talking about the big garage door where the cars go in or is this like a side garage door, or what do you mean by garage door?
A. The one that goes up and down where the cars go in.
Q. And the reason why you left that open was because why?
A. Because I knew that Uber was about to come in, so he can come in through that door.
Q. Couldn't he just knock on the front door? I'm trying to find out why you left the door open.
A. Well, I mean, so I was like sanding the dining table and the dining table is right next to the garage -- to the door that goes from the living room into the garage. And then I also was like packing things into the SUV. The SUV, I think, was like parked right outside,

and so I was going to have him like just basically, as soon as he came in to like continue packing those things that I have out here into the car. And then I figured that it would be more efficient since I was like 2 -- a few feet away from that door.

Q. Okay. But a year ago or approximately a year before this loss occurred in July of 2023, you were attacked at your home; correct?

A. Yes.

Q. And yet you still leave the garage door open? I'm just trying to figure out why you would do that.

A. Because he's -- if the -- if the application is telling me that he's going to be here in 10 minutes, like again, in terms of efficiency, I figured that that's where he can come through. And then I was just -- like I would have heard him like coming in. And that's exactly where -- the garage, you see the Uber like pulling up into the garage, and he came through the garage. Like, you know, like I just figured that that's how he could do it. Robin is --

Q. I'm sorry. Go ahead.

A. Robin is somebody that I did not want to see, that I have had a fight, he had stolen from me. And so, yeah, like, you know, it's not something like that I was expecting him to show up, and like, you know, just be


PLAINTIFF'S EXHIBIT PL103-085

like all like that. I mean, it was left for Edward to come in and so he can help me continue loading the car.

Q. Right. And that's kind of what I was getting at. I mean, after going through your experience, I would think you would be a little bit more, you know, cautious about leaving doors open, but okay.

So you left the garage door open and then Robin came in. Who is Robin?

A. Robin is the guy that I had met in the past. And he came and he told me that he wanted -- he was looking if I had any jobs for him. And I said, "Oh, yeah," like, you know, "I could use some help." And then at that moment, he was like running errands for me, things that I did not want to drive to, like dropping off boxes or like picking up things. You know, he was doing that for me.

One day, I told him like, "Hey, can you go to the grocery store? Here's a hundred bucks." I gave him cash and then buy food for my dog and then buy cleaning supplies, and then he left. And then when he came back an hour after, he told me he had spent it at the casino.

And you have to keep in mind, my experience in Palm Springs is that everybody here is a thief. Like Desert Hot Springs is a town that there's like a crowd of -- like, you know, it's the meth capital of the world.


PLAINTIFF'S EXHIBIT PL103-086

Apparently, everybody there is a criminal, and I'm not exaggerating. That's something I did not know. My experience in Palm Springs has been always every person I meet steal something from me. They think I'm weak or an easy target. So I don't leave doors open knowing people will steal things from me. To me, it made sense -- he was going to be here -- to, you know, leave a door open for him to walk in.

Q. So how do you know Robin?

A. I had also met him online.

Q. A dating app?

A. Yes.

Q. Is he also an ex?

A. No. Just a one-time thing and that's it.

Q. Okay. And --

A. But --

Q. -- had he done work for you in the past?

A. Running errands.

Q. Okay. And so did you know he was coming by that day?

A. No.

Q. Has he come by before?

A. I want to say a week or two before is when the money situation happened in the casino. And I told him to leave, so he left. And then he showed up the next



PLAINTIFF'S EXHIBIT PL103-087

day, and I was at the grocery store, and then I see on the camera, and he's like, "Oh, I'm here for my debit card."

And I recorded this whole conversation between he and I. And I was like, "No. You didn't leave anything."

And he was just like, "Oh, so you want me to call your job and tell them?"

I was like, "Tell them about what?" You know, like he said it like -- saying those things like he was upset. And he's like, "Can I jump over and then just wait for you in the patio?"

I was like, "Do not go into my house." Like "Don't come here. I want nothing to do with you."

So that was an attempt that he made to come here, but I was at the grocery store. And then he left.

Q. Okay. Again, so I think the question that I had was does he usually come by before? And you're saying a week before this incident is when you told him "Don't come by anymore"?

A. Yes.

Q. Okay. So then when he showed up that day, why didn't you kick him out?

A. I did. He was, "I'm just here to introduce a friend." And then he walks out, and then the friend


PLAINTIFF'S EXHIBIT
PL103-088

walks in. And then I was upset. I was -- I mean I was here, just standing up, you know, for them to leave. And then the guy was like, "Oh, nice house." I was like, "What are you doing?"

And he's like, "My name is Gary. I just wanted to introduce myself." He's like, "Can I leave you my phone number, and then we can chat later?"

And I'm like -- because I wanted him to leave, I was like, "Sure." So he wrote down his number and then he left.

Q. I'm sorry. I'm just trying to figure this out here. So you're upset at Robin because he stole from you a week before this occurred; right?

A. Yes.

Q. And then he shows up unannounced with another friend and you exchange numbers with him. I'm trying to figure that out. That's --

A. Oh, you probably need to listen what I'm saying. Robin didn't show up with the friend. I'm in the living room, and then he says, "Hey." And then I'm like, "Come in," thinking that it's Edward; right? As soon as I see Robin, and then that's when I'm like, you know, "Hey. What are you doing here?" And that's when he said, "No. I'm just here to introduce a friend." And then the other person walked in behind him.


PLAINTIFF'S EXHIBIT PL103-089

Q. That's what I'm saying. I don't understand this. So if Robin stole from you and you told him to go away, stay away, the fact that he shows up with another friend unannounced --
A. Right.
Q. -- and you take his phone number, I'm trying to figure that out.
A. Correct. So I am not a violent person. Like I don't -- in my mind, like that's how men act all the time. All these people, like once they're inside homes, like me saying like "Get out of my house" is not enough, you know. They get confrontational. And I'm really like scared of that. You know, I don't like -- like my ex used to do that to me. Like he would really like physically like handle me. And then I don't know how to -- you know, I guess I'm scared -- a scared person of this just violence. And all these people look violent all the time.
And like when he was here, I told him to leave. And then the friend said, you know, "Can I give you my number? You can call me later." And then I said, "Yes," because at this point, he's -- in my head, I'm thinking, okay, he's presenting an option for him to leave. I didn't want to say "No, you can't," and get him confrontational. Like, you know, that was that.

Q. Okay. So what was the purpose of you getting your Garrett's phone number?

A. He told me -- I told him "You have to leave." He's like, "Can I give you my number so you can text me later when you come back?" And I'm like "Sure," so he will get out.

He gave me the number, and that's when the Uber pulled up. I felt a lot safer because Edward is here. If anything, he can like kick them out. And so then he left.

Q. What is Robin's phone number?

A. It's all provided. I don't have my phone with me. But it was all provided to you guys.

Q. You gave it to Farmers already?

A. Oh, you know what? It's in that email that I sent to you when I -- that I sent to the police after the police report.

Q. Uh-huh.

A. Yeah. It's in that email when I provided it to the police.

Q. Okay.

A. Because I --

Q. And then is it Garrick or Garrett?

A. What you just said right now, to me, sounds the same. I apologize.

Q. Is it Garrick with a "k," or Garrett ending in a "t"?

A. It's in that email that I find out what his name is.

Q. You don't know offhand right now whether it's Garrick or --

A. I don't know. Garrett or Garrick like to me, sounds the same. Like I don't know.

Q. Do you have Edward's number?

A. Yes. However, like he's the one -- I also like don't have it with me.

Q. Okay.

A. But I also question him about you guys, and then like he said like he doesn't want to get involved. But I'll provide his number. I don't care. But tomorrow, I'm having my phone delivered.

Q. Okay. Did you ever speak with either Robin or Garrett after this occurred?

A. So that night when I was here and I realized that my things were gone, when I looked at the camera, then I saw the two guys with the mask, but that was obviously them, like, so I texted that phone number that Garrett had left me. And then I said "Hey."

And then he's like, "Hey, what's up?"

And I was like, "So what are you doing? So do


PLAINTIFF'S EXHIBIT
PL103-092

you want to meet?" But in my head, I was like seeing what he would say, you know. I was never going to meet with him, but I still like, you know, wanted to see how far they would go or like, you know, if he's going to tell me something.

And then he said, "Yeah. I'm busy right now," and that was it.

But then when the cops came in, I showed them the message. And then for Robin, I texted him and he never responded anything.

Q. Okay. So you have not had any conversations with Robin?

A. No.

Q. And then other than that text with Garrett, have you had any other communications with him?

A. No.

Q. Okay. So then Edward came and you guys left around noon. So if you left Palm Springs around noon, do you remember what time you got to Reseda?

A. No. I want to say 3:00, 3:30.

Q. And when you arrived at Reseda, that was at the Reseda property; correct?

A. Yes.

Q. Okay. And at that time, the property was vacant?

A. No.
Q. Okay. It had rentals -- I mean you had tenants there?
A. Three of them, yeah.
Q. I'm sorry?
A. Three of them, yes. Three of the four.
Q. Do you remember their names?
A. One is Joseph. The other one is Marcio. And the other one is Jose. However, they all left in bad terms.
Q. Do you have their contact information?
A. In my phone.
Q. Well, you have their lease agreement; right?
A. Yes, I do.
Q. What I'm going to do is I'm going to request that you send me copies of the lease agreement that you had with these three tenants for the Reseda property.
A. Yep.
Q. And then I'm assuming the contact information is there, but if it's not there, then can you also provide me with their contact information?
A. Yes.
Q. Okay. And then at the property, you and Edward do your work. You guys leave around 8:30 p.m. you said?
A. Yes. Approximately, yes.

Q. Okay. And then you drop Edward off at his house, and then you came home alone; right?
A. Drove to his house, and then I drove here. Yes.
Q. Right.
So then when you came home, the house was dark. You said you opened the garage door?
A. Yes. It's -- it has its own backup battery.
Q. Then I assume you parked the car in the garage?
A. Yes.
Q. And then you came inside, saw your dog, and then at that point, there was no light on inside the house; right?
A. Correct.
Q. Okay. So then can you describe the situation with the electricity. What was that?
A. So when I walked outside, I went -- everything is dark; right? So I went to the panel, and then that's when I noticed that the cover that the panel had.
Q. Uh-huh.
A. It was on the floor. And the main switch, it had been turned off.
Q. Okay. So you turned it back on?
A. Yes.
Q. And the power came back on?
A. Yes.

Q. So other than the cover for the panel being on the ground, was the damage to the panel -- was there any other damage?

A. All of that, I noticed the day after. A few hours later when it was like bright, which was the camera right next to it, and the -- and then the window.

Q. Right.

But, again, you listed the panel as one of the items that needs to be replaced. I'm wondering why does it have to be replaced if the only damage was to the cover?

A. Because like the main -- the main switch, I think it had been tampered, because like when I like turn it off like, you know, it wouldn't want to like turn off. Like it was always like normal; right? But this time, it took me -- like it gave me a hard time right here doing it (indicating). And then like it looked like tampered, you know. I -- that's what I think. I don't know how they turned it off. Like, you know, with something or they intended for it to like never turn on. But right now, for example, it's broken. Like it's completely gone.

Q. But you were able to turn the power back on that night; right?

A. Right. But then like a couple days later,


PLAINTIFF'S EXHIBIT PL103-096

because it had been tampered, it just like popped out.

Q. What popped out?

A. The switch. Like, you know, I can send you a picture if you wanted. Like, you know, one day, I was like trying to turn it back on again and like off and on, and it just -- like it popped out, like broken, because it was cracked.

Q. Okay. So that's after -- well, that's a couple of days after you were saying?

A. When I went to turn it back off and then back on, yes.

Q. Okay. But that night when you turned the power back on, the power inside the house came back on; right?

A. Yes. Except in few rooms. Like so the main panel, when turned off, like for some reason, it still powers the A/C in this room, which is a separate A/C unit. So no longer -- the main panel is supposed to turn off everything, but it no longer turns off everything, so that's what I didn't understand. So the next day, I was like looking into it -- a couple of days later. And then that's when it just basically popped out. And then right now --

Q. Okay. Did you ever have an electrician do a diagnostic on the panel and say exactly what's wrong with it?

A. The Kings Power, that estimate that I sent, he's mainly an electrician.
Q. Right. But other than an estimate where he just says it has to be replaced, did you ever get a diagnostic explaining --
A. No.
Q. -- what was specifically wrong with the panel?
A. No.
Q. Okay. So I'm going to make a request here, and I don't know if you'll be able to get it. Sometimes I have insureds get it. Sometimes they were not able to. But I'm going to request that if you could contact your power company. And I don't know -- is it Edison, Southern California Edison?
A. Yes. I contacted them but --
Q. Could you contact them and ask them if they can provide you with your daily electrical usage log for the date of the loss of June --
A. Yeah. It's in the bill; right?
Q. June 3rd. Right.
A. For one day only?
Q. Yeah. Just a daily log for June 3rd.
A. Okay. I can do that.
Q. Okay. So then you turned the power back on, came back inside the house. The first thing you noticed,

you said, the laptop was missing, the Bank of America one from your work?

A. Yes.

Q. And then you saw the missing painting afterwards; correct?

A. Yes.

Q. Okay. And then you called the Bank of America Corporate Security that night at that moment; right?

A. Yes.

Q. And you called them with your cell phone; correct?

A. Yes.

Q. I'm going to also request that you provide me with your cell phone log for that day.

A. Yes.

Q. And you can write this down, but it's going to be in your transcript, so in the event that you're not able to write it down, don't worry about it. It's going to be in the transcript.

So then you called Corporate Security, and then you called the police, and they came, you said, nine hours later. Essentially, they came the next day.

A. Well, the same day because it was already past midnight.

Q. Oh, that's true. Okay. Gotcha. All right.


PLAINTIFF'S EXHIBIT
PL103-099

And then you made an inventory of missing items. So you made an inventory at that moment?

A. Yes. I mean, I was -- knowing that a burglary had happened, I felt scared, so like I couldn't sleep. And I know that when the police will arrive, they will come and ask me what was stolen. You guys will ask me the same thing. So I figured I needed to sit down and just see what was missing.

Q. Okay. And so then the police came, you said, the next morning or the next day or actually the same day, about nine hours later. And can you describe the interaction with the police when they came? Like what did they do?

A. It was really quick. Like he looked like -- like when I -- when I took him outside and when I showed him the window and everything, he didn't took fingerprints or anything. He's like okay, he gave me his card, and he said he was going to prepare the report and it will be here -- he will need me to send him an email with a list of the things that were stolen. But he asked if he could take a picture of the one that I had written. And I said, "Yeah. Of course." And then he did, and then I sent him the list, and then he provided the police report that same day.

Q. Okay.


PLAINTIFF'S EXHIBIT PL103-100

A. But it was really quick. He was here not even three minutes.

Q. That's it? It was really short?

A. Yeah. They were like -- yeah.

Q. Didn't he take like a statement from you? I mean, that must have taken at least 10 minutes. No?

A. No. The police department, they -- it's a small town. They know me. I have issues with my ex before with the domestic violence. Especially when we were fighting at the end, they got involved. I can honestly tell you they're not a big fan of me. Like they just -- yeah, every interaction with them has been horrible.

Q. Okay. But, again, didn't they take a statement from you at that time?

A. That was enough for him, I guess, because they have a worn camera, you know. And I was explaining to him as I walked him outside, and he didn't ask any further questions. He's just like, "Okay. Let me take a picture of that. And here's the police report. Send me an email."

Q. Did you review the surveillance video with him?

A. I was trying to show it to him, but he showed no interest. And he said like just send it in an email as well, and I did.

Q. Okay. And you said they didn't take

fingerprints?
A. No.
Q. Okay. And you suspect that it was Robin and Garrett who were involved in the theft; correct?
A. Yes.
Q. And you told that to the police; correct?
A. Yes.
Q. Do you know if they've done anything with that information?
A. So it got assigned to a detective.
Q. Okay.
A. And then the detective was going back and forth with me telling me how long it was going to take and following up. And then one day, he stopped responding.
And then I know the lieutenant there, Erik Larson. He's -- he definitely does not like me. Like, you know, I don't know what they have in their department. Every time they come here, it's just like -- I don't know. It's just that. But the detective stopped responding. So what I did was I exercised my right to obtain the police report through their system. And then when I received it, that's when I noticed that the police report says like "Suspects unknown," and it pretty much goes that way.
So I asked Erik Larson. And he said, "Well,

they were wearing masks. We don't have any way to identify them."

And then I was like, "Okay. Just so you know, I have the information." Because I then started -- all I did was like "Robin in Yucca Valley," because he told me that he lives in Yucca Valley. And then he first came up "Robin" -- I don't remember his name, but I provided it in that email.

And then I typed "Garrett in Yucca Valley," and then like one came up. And then I looked him up, and he was arrested already for burglary that day when I saw him online. So I was like this must be him because I also Googled the phone number that he had given me, and then his full name came up.

So then I provided that to the police. I said like, you know, "This is them," like, you know. And they said, "Okay. We'll investigate, and we'll let you know." But they haven't said anything after that.

Q. Okay. So as far as you know, Garrett and Robin, they've not been arrested or charged for --

A. For this? For this --

Q. Yes.

A. -- theft? No, as far as I know.

Q. When was the last time you had any communication with the police regarding this matter?

A. I sent them an email following up, and he doesn't respond. But the last time that he actually said something was that email that I sent to you --

Q. Uh-huh.

A. -- when he said, "We'll give it to the detective and contact me if you have any questions."

Q. Okay. So then going back to your statement earlier. I just wanted to go over the surveillance footage and the camera. So how many cameras were there at the house?

A. So one is the doorbell. The other one is in that side patio next to the electrical panel. And another one inside in the master bedroom.

Q. So I think the videos that you had sent to me, there were three of them, those were from the door camera and the side patio camera; correct?

A. Yes.

Q. Okay. Are there any images or videos from the camera inside in your master bedroom?

A. No. Remember, they had turned off the power before breaking in so --

Q. Okay. And the door camera, is that a Ring camera?

A. No. It's from Ubiquiti.

Q. And that's the same with the side camera?


PLAINTIFF'S EXHIBIT PL103-104

A. No. That's Eufy, E-u-f-y.
Q. And these cameras, I'm assuming they have apps that you can download onto your phone?
A. Yes.
Q. Okay. But for some reason, you were not -- well scratch that.
You have those apps on your phone; right?
A. Yeah.
Q. Okay. But on that day, you did not receive any notifications from these cameras?
A. I actually did. I received one notification.
Now, I received like motion notifications like a lot like. But when I received that notification, I remember Edward and I, we were probably 10 minutes close to like getting to our final destination, and then I opened it and then it said something like "Connectivity error." And since that happens a lot like, you know, I figured that maybe it's something with the Wi-Fi or it was just like giving me another motion or like I figured that if somebody was really there, it was going to send me maybe more later, you know. So I just left it like that thinking that it was --
Q. And do you remember when you got the notification, which camera it was coming from?
A. I don't recall. But my dog is more important


PLAINTIFF'S EXHIBIT PL103-105

than my own life. If I had known that or suspected that somebody was here, I would have dropped everything and driven here like right away. I honestly didn't think like it was something to look for. Like, you know, just felt that it was a connection error.

Q. You said something about Spectrum notifying you about an internet outage.

A. I had received an email saying -- from Spectrum saying there was an outage.

Q. That was on the same day, the date of the loss?

A. Yes.

Q. Okay. And you think you received that email while you were in Reseda or --

A. I came to find out about the email actually after I had called the police. Like it was like 1:00 or 2:00 a.m.

Q. Okay.

A. Right? And then when I was going in my cell phone, because I couldn't connect to anything here, like I was getting like really irritated, you know, like scared, wanting to see the footage. And it was not connecting, so that's when I opened my email and I saw that email, like that's -- I don't remember when it had been sent to me, but I remember it got sent like a second time and then a third time saying it's already fixed.

Q. Do you remember approximately when it was the first time you saw the surveillance video? It was that night; correct?

A. No.

Q. No? When was the first time you saw the video?

A. Like right before the cop came in.

Now, so when I was trying to look at the footage, it was not connecting. So what I proceeded -- I ended up like then resetting my modem, resetting my router. And that wasn't working, so I was getting frustrated thinking that I deleted everything. And then at one point, the Eufy camera showed me -- of them walking by really quick. And then I tried to look at it again, and then it would give me server error messages.

And the cop wasn't interested in even watching the video, and I couldn't pull it up. And I told them that I needed to breathe or calm down because it was just like overwhelming and nothing was working. So I waited a couple of hours, and then I reset everything, like change all the passwords again, and then have to go through each device, change the passwords. It was a long process. Finally, it then gave me access to the footage.

Q. So that was a couple of hours after you got home then?

A. A couple of hours. I saw one instantly because


PLAINTIFF'S EXHIBIT PL103-107

I was like, "Oh, shit." I'm sorry. I was like, "Oh, wow. Let me see it again." It was giving me server error messages. And it wasn't until that evening on July 4th, like at 8:00 p.m., where finally, I was able to see the video and see the video on the other doorbells as well.

Q. You said July 4th. Do you mean June 4th?

A. I'm still -- yes. June 4th.

Q. Okay. So the first time you saw the full videos were in the evening of June 4th?

A. Yes, approximately. That or June fifth. I don't remember. Like I remember it took awhile, but yeah, it was not July. Hours later.

Q. Okay. Do you have any idea how the suspects, you know, took the painting? It's a pretty big painting from the way you described it, so --

A. So when they first came here, when they knocked on the door, they were driving a car, which is on the surveillance videos. When they walked in here the first time wearing masks, they walking -- they came by walking, you know, wearing masks from the corner. I don't know where they parked the car, but they definitely would have needed a car like because it was a big painting.

Q. Right.

A. They couldn't roll it or anything.

Q. Right. You know, for example, the video you had sent, you know, one of them in your door camera shows the two guys parking their car, like you just stated. But when the loss occurred, there was no video from the front door; right?

A. There is.

Q. There is?

A. Yeah.

Q. From the front door?

A. Yeah. When they're walking, like two hour and a half later, when they're -- like the first appearance, what it is is them walking from like the corner, like just walking in front of the house wearing masks in the middle of the street, and then walking back again to the corner, and then walking back in.

Q. That's from the front camera?

A. Yeah. It's the video that I sent.

Q. I'm sorry. It doesn't show the car is what I'm saying.

A. Yeah. That's the thing, it doesn't show them driving the car.

Q. Right.

A. After they -- but then again, I'm assuming after they powered the house off, maybe one of them went and got the car. I don't know how they left like. Yeah.

Q. Uh-huh. Okay.

MR. NA: All right. Let me show you the next document that I want to go over with you. This will be Exhibit 3 to your transcript.

(Exhibit 3, remotely introduced and provided electronically to the reporter)

BY MR. NA:

Q. And if I've done it right, it should show a copy of the police report.

A. Yes.

Q. Do you need me to enlarge it?

A. No. It's perfectly fine.

Q. All right. Obviously, you've seen this document before; correct?

A. Yes.

Q. In fact, this is something that you sent to me, so I imagine you have seen it. Okay. So it's got here in the upper left corner, the date and time of the occurrence. June 3rd between 12:30 and June 4th, 1:00 a.m. And then it's got date and time reported, 3:25 on June 4th. That looks like 3:25 a.m. Does that sound accurate?

A. It could be. Like, I mean, I don't know.

Q. You have no reason to dispute it though; right?

A. Okay. Yeah. The police, they had probably

given me 7 police reports in the last 12 months. And every one of them -- well, one thing that they are known for, at least, is to be completely inaccurate to like -- like not include information or lied in the reports. I have escalated this to like the DOJ and like, you know, California, and they do that a lot with me. Like they --

Q. Let me ask you this. You just said they have given you 7 or so police reports. Is that related to this claim?

A. No.

Q. Okay.

A. Like what happened with my ex or other robbery.

Q. Okay.

A. Yes.

Q. Gotcha. All right.

Okay. So moving on. Obviously, it's got your name and description as the victim. And then here under Section Case Summary, "Unknown suspects forced entry and removed items from" your home; is that accurate?

A. Yes.

Q. Suspects unknown. Now, in your mind, this is not correct because in your mind, you know who the suspects are; is that correct?

A. Yes.

Q. Okay. Moving on. It's got a list of the items.


PLAINTIFF'S EXHIBIT PL103-111

So this is the list that you had prepared while you were waiting for the police that night?

A. Yeah. And I feel like that's -- the list that I had prepared did not have any value next to it because that takes time. But the police, when he was here, he told me like "What's the value of just one of them?"

I'm like, "Well, it's a lot. I would have to find."

He said, "Just put any amount."

I'm like, "Okay."

And then he's like, "Yeah. It doesn't matter. Just put any amount."

And then that's why I just write it down like really quick, like 1, 2, 3.

Q. Okay. So this amount here that says "Total Property Value, $18,800," you're saying that's something that the police told you to put in there?

A. They didn't told me to put in 18,800. They told me to add any value approximately of what each item is.

Q. Okay.

A. So I add it up. And then like also the list is not complete like as I went to discover like -- or I think it's all -- but, I mean, there was another robbery, they did the same thing. Like they don't really care so much about the accuracy of these amounts or like

products.

Q. So here, one of the items you have listed is window and repair for damage done to window, a thousand dollars. That's just, again, an estimate that you came up with?

A. Given that they didn't give me time to like do the research.

Q. Right.

Okay. And then the same thing here with the artwork?

A. Yeah. The same thing that I remembered. I thought I paid 5,000 for it.

Q. Okay. Moving on then. Property, one of the items is a digital footage of suspects in the backyard of home. And that's after you had sent the video to the police; correct?

A. Yeah.

Q. Okay. Description of the suspects. This is based on your review of the videos?

A. No.

Q. No?

A. Based on my reviews?

Q. Yes.

A. Oh, I mean based on their review like --

Q. Their review? So they saw the video at this

point?
A. Yeah.
Q. Okay. Going to the Narrative section of the police report. Under the section heading "DETAILS," if you can just quickly take a look at that and make sure that it's accurate as far as you recall.
A. If you can you keep going down.
Q. Sure.
A. So like in here, it mentions -- I mean, I'm just saying -- what I'm really like picky about like what he's saying when he says, "Ravada stated that he also found that the bathroom window located approximately seven feet north of the breaker box was ajar. Ravada stated at the point he became suspicious and began taking an inventory." I noticed that the window broken -- the broken window the day after. I mean, I'm sorry, like an hour before he came here. Like, you know --
Q. Okay.
A. -- so like I just want to say that.
Q. Okay. But, again, it was before the police arrived; right?
A. Yeah.
Q. So that's the way he wrote it up. He or she.
Can I go to the next page?
A. Yes, sir.


PLAINTIFF'S EXHIBIT
PL103-114

Q. Okay. And then all of the list of items here.
A. Yeah.
Q. Okay. And the next three paragraphs, are those accurate?
A. That's weird because the repair cost approximately 600.99. Is that a code? I don't remember saying 600.99.
Q. I'm assuming the "USC" here refers to United States currency, but I'm not sure.
A. I don't -- they asked me to provide rough estimates. I will not provide 600.99.
"Estimated the total loss to be approximately 18,000. Ravada stated the property was equipped with security cameras but" -- okay.
Q. Okay. And then the last paragraph on this page.
A. Yeah.
Q. Okay. And then I think this is the last page.
A. Yes.
Q. Okay. So now you're saying that this report then -- or actually the police then assigned an investigator or a detective; right?
A. Yes.
Q. Okay. And was the detective's name -- I know you had mentioned this earlier -- was this Erik Larson?
A. No. That's the lieutenant.

It's Doherty. Somewhere here, if you keep scrolling down.

Q. So we're now looking at emails that got sent to me in addition to the police report. Detective Doherty, is that the one?

A. Yeah.

Q. I had a question about one email that you sent. There's one email in particular -- hang on. Let me find it for you.

A. That's Alexander Doherty.

Q. Yeah. That's the detective's name.

Okay. This is Garrett Yeckley. Is that the individual that you were discussing earlier who came with Roger?

A. Garrett. Okay. There you go.

Q. Okay.

THE REPORTER: Counsel, could I get the spelling of that? You scrolled a little too quickly.

MR. NA: Oh, sure. G-a-r-r-e-t-t. And then the last name is Y-e-c-k-l-e-y.

BY MR. NA:

Q. Oh, right here. This is your email dated September 9, 2024 to Erik Larson. And in it, you write "Hi Mr. Larson. I haven't heard from you either about my June 4, 2024 case. I asked you if something was done now


PLAINTIFF'S EXHIBIT PL103-116

that I got you the full name for both suspects? FYI, Kyle just texted me less that 5 minutes ago that he is on the phone with Robin talking about getting my painting back, he said he will call me soon." What does that mean?

A. So this guy Kyle, it's another acquaintance here in this town, and like he is known and I told him what happened. And then I told him who it was and I showed him the picture of Robin. And then he told me that he knows him and that he knows he lives in Yucca Valley.

And then Kyle is a pretty big guy, scary guy, like, you know, like he's always constantly -- like he's like punch fighting. Anything like, you know, irritates him a little bit. But then he was like telling me like he knew -- he can get to him, to Robin. He can find out where he lives. And what he's going to do is he's going to have him meet up at some hotel in Yucca Valley, and then he was going to like beat him up. And then he wanted me to like show up later and then basically, so I can tell him off. And I was like wait. I was like -- because I don't like to -- I cannot even imagine what I would do in a violent situation like that. It's just not for me. So I told him like well, if you can get to him, I think that the right way of doing this is to have the police go and take him. Like, you know, not you. Like,


PLAINTIFF'S EXHIBIT PL103-117

you know, if we can get in trouble. He's like, "No. We're not going to get in trouble." And I was like, "Yeah. I don't think" -- so I was like -- I also have read in the policy documents that if a person is able to help to get to the suspect, like you guys pay 10 percent reward of the value of the item; right? And I told him like by the way, like if you help him, like I think insurance has a reward for it, 10 percent of the value.

But I was like, "But let me find out first what their process is. Don't do anything as far as like you going and get to him. Like if you want to find out where he lives, get his information displayed. But I'm going to ask the insurance what's their process if I know somebody that can get to this guy, what I need to do."

And then I reached out to you guys, and they -- that guy, Brian, he did say that it was under investigation under oath and he couldn't respond to my message.

And then Kyle called me later that day when I sent this email saying like, "Hey, I have him on the phone." So that's why at that moment, I figured that the best thing for me to do is to tell the police.

I had already told the police that Kyle knew where he was and he was going to find out information. So I didn't want -- I thought if Kyle goes and does


PLAINTIFF'S EXHIBIT PL103-118

something crazy, goes and gets him, beats him up or something, at least I wanted to wash my hands by saying I reported it. I have nothing to do with it. And I have not been present when he asked me to be present for such event. And so when Kyle told me he had him on the phone, that's when I sent -- a second after, I sent this email to him, so that way it is on record that I reported what Kyle's telling me.

Then Kyle ended up showing up that afternoon and then showing me the messages between him and this guy, but it ended up that he had texted the wrong person, so it was not even Robin.

Q. So it's not Robin?

A. No.

Q. Okay. So this Robin is not the Robin that you were suspecting of taking your items? Kyle was texting a different Robin?

A. Well, Kyle, I guess, knows Robin as Rob. And then like the guy that he had texted was another Rob, but Rob, as in Robert.

And the guy was all the time denying everything, like "I don't have anything. I don't know no Julio."

You know, and then Kyle was like I'm going to do this to him, telling him off. And then finally, I guess, like they call each other or like video chat, and then


PLAINTIFF'S EXHIBIT PL103-119

noticed, "Oh, shoot. It's not you. Sorry, man," you know.

Q. Okay. So nothing came of this?

A. No.

Q. Okay. So then did you tell the police officer after that what Kyle said is wrong because it's a different Robin?

A. No. Because they haven't -- they don't respond to me. Like they don't -- yeah. They're just ignoring me.

Q. Okay. Let me go over the next document.

Okay. You should see on your screen the invoices and receipts that you had submitted to Farmers during the course of the claim.

MR. NA: This is will be Exhibit 4.

(Exhibit 4, remotely introduced and provided electronically to the reporter)

BY MR. NA:

Q. So I don't want to go through all of this page by page, but I did just kind of want to assure you, Julio, that we did receive your invoices and that they are going to be a part of your transcript here.

So just quickly, this first one appears to be an email that you received from Best Buy, and I'm assuming it's for the bluetooth speaker from Sonos.


PLAINTIFF'S EXHIBIT PL103-120

A. Yeah.
Q. Just a couple quick questions. It appears to have been picked up in Canoga Park.
A. Yeah.
Q. Was this for your Reseda property?
A. I bought it when I used to live in Reseda, right, and then Canoga Park is the Woodland Hills store.
Q. Okay.
A. So that's where it got picked up, and I moved it here.
Q. Okay. All right.
Moving on. This is also a receipt, it looks like, from Best Buy, and I think it's for your drones.
A. Yes.
Q. Okay. And then you've got a receipt here also from Best Buy for your MacBook Air.
A. Yes.
Q. Okay. And then you've got an Amazon receipt here. Now, this one, it looks like was paid by your LLC?
A. So Amazon Business Prime -- they have a Business Prime and a Personal Prime, but they also have a hybrid account, and that's what I have when my personal and business are part of the same benefits. It's one Prime membership.
Q. Okay. So when you purchase items from either


PLAINTIFF'S EXHIBIT PL103-121

Amazon or any other vendor and use your LLC, as opposed to your, you know, personal name, is that for any business purpose?

A. Not specifically for Amazon, because on Amazon, I have a hybrid account. But, for example, when -- I wouldn't use a business credit card on a personal transaction.

Q. Okay.

A. So that's, I think, I'm using my personal debit card right here.

Q. Okay.

A. Yeah.

Q. Even though it's paid through the LLC, do you think you paid for it with your personal credit card?

A. I know I'm using my personal credit card. I'm not using any of my business cards right now.

Q. Okay. And this was for 272; right? Okay. So the only item that's part of this claim is the one that's circled here; correct?

A. Yeah.

Q. Do you need me to enlarge it?

A. No, no, no. I know that's the one. Yeah. That's why I circled it.

Q. So the other items on top here are not part of the claim? It's just the items on the bottom?

A. That is correct.
Q. Okay. The next receipt is from Dyson, and this is for a lamp or --
A. Yes. That's when I noticed that the camera is not there, and I explained also when I referenced this document, about them giving me a discount 150, because when I looked at the replacement cost, it's the 806.
Q. But you paid 656 though; right?
A. Right. After receiving the -- right. That's what I paid. Yes.
Q. Yeah. Okay. And again, this appears to have been ordered at your Reseda property?
A. Yeah.
Q. So this would have been, I guess, before you purchased the Palm Springs property?
A. Oh, yeah.
Q. Okay. And the American Express card here, that's your personal card. That's not your LLC?
A. Right. That's -- it has to be.
Q. Okay. All right. This is still part of the Dyson lamp; correct?
A. That's correct.
Q. Okay. We've got another receipt here that looks like it's also from Best Buy, and this is for a Samsung TV.

A. Maybe go next page. It's not about the TV. I'm not claiming a TV.
Q. Oh, okay.
A. There. The watch.
Q. The watch? Okay. So like this one, it looks like it was shipped again to your Reseda property in February of 2022.
A. The TV only.
Q. Wasn't the TV picked up? Here. Let me zoom in.
A. I don't remember. What was picked up was the watch, from what I can recall.
Q. I don't know. I guess the question -- the real question is, you know, at this time, weren't you in your Palm Springs property?
A. No.
Q. No?
A. So February -- no. That's when Julio Sanchez was working here. No. I didn't -- I officially moved here September 9th, 2022.
Q. Okay. And then you've got some more Apple products. Another invoice from Amazon. This is for Apple AirPods. Another invoice from Best Buy, and this is for the dishwasher.
A. Uh-huh. Yes.
Q. Okay. And so again, this was delivered to your

house in Reseda?
A. Yes.
Q. Why didn't you have it delivered to Palm Springs?
A. Because I was in Reseda. And then at that time, like the floors were being worked by Julio Sanchez. The house was empty. You know, expensive appliances here just to be left by him and his workers, I did not feel like -- that I was keeping it safer being at my house.
Q. Okay. And another receipt from Amazon, and this is for the switch?
A. That's probably the Brilliant switch.
Q. Okay. And then this receipt from Amazon's in Spanish. I'm assuming it's for lights?
A. It's for the main lamp that -- yeah.
Q. Okay. More receipts from Amazon.
A. I want to say I provided two receipts of Amazon in Spanish. What you just went through right now, that, are two different lamps. What you can see is that I have one here left like, you know, so I wanted to basically prove that I bought two.
Q. Okay. But only one's part of the claim?
A. Yes.
Q. And then an email from B&H Photos?
A. That's more lights.

Q. More lights. Okay.
And then I think this is your order confirmation from Sonos for the sound bar?
A. Yeah.
MR. NA: Okay. The next document, this will be Exhibit 5. And this is the estimate that we received from you from Kings Power Electric.
(Exhibit 5, remotely introduced and provided electronically to the reporter)
BY MR. NA:
Q. So just a couple of questions on this one.
So again, obviously, you've seen this document before?
A. Yes.
Q. Okay. So starting here on Page 2, Project Outline, asbestos and mold testing, why is that necessary?
A. It would have -- so I remember telling him that the water came out through the toilet; right? And then because it's wall hung, the toilet is not piped through the floor, but through the wall. He figured that like testing for mold should be done.
Q. Okay. But I mean, you've been doing work at the house for over a year. Did you have any asbestos issues?
A. I have had asbestos tested before. I don't know

what you mean by asbestos issues. But every time a wall has been opened, because the house was initially built in 1950-something, my understanding and the way that it's been explained to me is that asbestos should have been done every time I've had it done.

Q. Okay. So again, though, I mean, you've been doing work at the house, and you've just said you've done asbestos testing before, so why do you need to do it again?

A. Okay. So I don't know if asbestos -- for example, on the claim that happened here in January, when the hurricane happened, Hurricane Hilary, and then like water came out through the ceiling, you guys paid for asbestos and that was tested.

Like I don't understand asbestos well. Like, you know, I guess if this area is opened, and there's no asbestos, does that mean the entire house doesn't have asbestos? Or could it be asbestos can be found in only tiny places. I have no idea.

Q. Okay. So you already had asbestos testing done in January, you said, '24?

A. Off the ceiling in the living room, yes.

Q. And that was for a water damage claim?

A. For the Hurricane Hilary storm.

Q. With respect to the mold testing, do you have



PLAINTIFF'S EXHIBIT PL103-127

mold at the house?
A. Not that I can see.
Q. Okay. And then the main electric panel replacement, we discussed that earlier.
The guest bathroom window replacement, so I think we kind of discussed that earlier. But, again, the window you're saying has to be replaced because the frame is --
A. It's --
Q. There's a hole in the frame?
A. Yeah.
Q. Okay. And then the toilet, again, I think we discussed that earlier as well.
The dishwasher, why does the dishwasher have to be replaced?
A. Because like when I came, like it had -- I think it had been tried to be pulled out, but it was -- like on the side of the dishwasher, it looked like it had been chipped. And basically also because it's a two-drawer dishwasher, the bottom one, the main line of water that goes into the water areas, it had been cut up.
Q. Okay. But does that mean that the entire dishwasher has to be replaced? Don't you have to reattach the line?
A. Again, I don't know. Like you can send your own


PLAINTIFF'S EXHIBIT PL103-128

estimator. And then like, you know, because I was expecting that you guys would send somebody since that has happened before, but you guys told me to find my own auditor, and so I don't know. If it can be repaired, by all means, have it repaired.

Q. Well, let me ask you this. Again, the house was listed after this loss occurred, so did you replace the dishwasher before listing it?

A. No. Still the same.

Q. Okay. So according to this from Kings Power Electric, it says the panel -- electric panel replacement is required due to the existing panel that's out of market for fire risk. So is that the reason why it needs to be replaced?

A. That's what he said that he couldn't repair the main switch because like, per code, that's not allowed. They're not allowed to do it.

Q. So it's not that it's damaged. It's just that it's out of market for fire risk?

A. It is damaged. It has to be repaired.

Q. Okay.

A. But I guess it has to be replaced instead because it is like out of code or something.

Q. Okay. But as of right now, it has not been replaced?


PLAINTIFF'S EXHIBIT
PL103-129

A. From now, it has to be replaced, yeah.
Q. No. But it has not been replaced yet?
A. It has not been replaced, no.
MR. NA: Okay. Moving right along. The next document, I believe this was submitted by you during the course of the claim before I got involved. And this will be Exhibit 6 to your transcript.
(Exhibit 6, remotely introduced and provided electronically to the reporter)
BY MR. NA:
Q. And I believe it's a photograph of the painting in the background; is that correct?
A. Yes.
Q. Okay. So is this photo taken inside the Palm Springs property?
A. Yes.
Q. Okay. And do you remember approximately when this photo was taken?
A. Yes. I have it right here. That exact photo, no. But if you right click on it and then get input, that will tell you when it was taken.
Q. Well, that's going to show you when I made the PDF, not when it was taken.
A. Oh. You made a PDF?
Q. I don't have the actual photo that you uploaded.

I just have PDFs.
A. Oh. I was preparing my notes because I know that the agent had an issue with the color of the dining table. And then I was going through my pictures, and then I saw this picture of when it was black, and it says May 29th, 2024. But I have a similar -- it's not that exact picture, but actually, I have the picture in front of me, another one. It's dated May 29th, 2024.
Q. Okay. So do you think -- well, again, let's just add this to the reference. The table here is black, and that's the dining room table; correct?
A. Yes.
Q. And off to the left-hand side in the background, there's a desk there, and that's the desk that you were referring to earlier; correct?
A. That's what I'm sitting at right now.
Q. Oh, okay.
So in this photograph -- this dining room table, by the way, is that like concrete?
A. Yes.
Q. Okay. So is it attached to the floor?
A. Yes.
Q. So can you move it?
A. No.
Q. Okay. So this dining room table is pretty much


PLAINTIFF'S EXHIBIT PL103-131

set at this location?
A. Yeah.
Q. Okay. And in this photo, the table is obviously black. What color is the table right now?
A. Gray.
Q. Okay. So do you remember when the color was black?
A. So I have worked this table like many, many times. I am the one who put the black epoxy, and then right at the curve the epoxy, it drips because of gravity; right? It falls down. So I wasn't liking like the finish.
And so on May -- I don't remember when exactly I changed it to black, but I remember that on June 2nd, I purchased the material needed to change it to like gray color, and I provided that receipt.
Q. Okay. So you changed it from black to gray, which is the color it is now, sometime in June of 2024?
A. On June 2nd.
Q. June 2nd. Okay.
But it was black before then?
A. For -- yeah --
Q. Okay.
A. -- not too long.
Q. And so looking at this photograph and just

looking at what's in the background, do you think this photograph, the painting in the background, was taken sometime before June 2nd, 2024?
A. Absolutely.
Q. Okay. Do you remember approximately when?
A. Based on -- I have another picture of the same black table -- and it's May 29th, so sometime in May. I can definitely find the receipts of the black epoxy that I purchased for sure.
Q. Okay. The next photograph, do you recognize what that photograph shows?
A. That is what it is right now, that glass shelf.
Q. Okay. It's a glass shelf and inside the shelf, there are one, two, three, four, five, six, seven items.
A. Yeah.
Q. Are these items missing, part of the claim?
A. No. They are the ones that were brought in after.
Q. Okay. Is this a shelf where the --
A. The figurines and snow globes were in.
Q. Okay. Thank you for that.
All right. And then this photograph, do you recognize this item?
A. Yes.
Q. Okay. What does this show?

A. The kitchen.
Q. Okay. And this is a view from the dining room?
A. From the desk that I'm in, sitting right now.
Q. In the foreground here on the left-hand side, that's the shelf that we just discussed --
A. Yeah.
Q. -- in the prior photograph; right?
A. Yes.
Q. And so do you remember when this photograph was taken?
A. Right before you guys send me to examination under oath, so maybe like a month or so ago.
Q. And do you remember the purpose for taking this photograph?
A. Well, what the guy told me is that he wanted to see the hole on the wall. But I'll be frank, I knew that he was like looking for something else, because he said that he wanted to see if he needed to repair the hole in the wall where the painting was sitting, so that's what he said he was doing. But I just took a picture of everything, because he told me to take a picture from here looking at that view. So I guess I -- yeah, I don't know.
Q. This is a view towards the kitchen, and it doesn't show where the painting was hung; right?

A. No. It would be towards the left area.
Q. Okay. So you just took this photograph just to show --
A. He said he wanted a picture of where the dishwasher is, where the dining table -- yeah. I sent him like three different pictures.
Q. Okay. And so here on the left-hand side, I'm assuming that's the refrigerator?
A. Yeah.
Q. And directly opposite that, is that the island?
A. Yeah.
Q. And is the island concrete?
A. I added the concrete one time, because the thing I have was I wanted this house to be like a concrete look. I wanted the walls to be concrete. And one day, I added -- I basically resurfaced it with like this thin decorative concrete, I guess.
Q. Okay. And so the floor is concrete as well?
A. The floor is epoxy.
Q. Epoxy. Okay.
And then the island is concrete. And then the table that we saw, the dining room table, earlier, that's also concrete?
A. Yeah.
Q. Okay. And going back to this island. Did you


PLAINTIFF'S EXHIBIT PL103-135

construct this island or was this island here before?

A. The island was there before, but I didn't have the concrete. Like, I guess, it had concrete, but it had been painted, and then I sanded it, and then I put the concrete layer on top of it. But I have put like several layers, like I was practicing it.

Q. Okay. And then inside the concrete -- I'm sorry. Inside the island, that's the dishwasher; correct?

A. Yeah.

Q. Okay. Is that dishwasher the one that you had replaced? I mean, not replaced, but that you had purchased and put in?

A. Yeah.

Q. And is that the original location of the dishwasher or did you have to move the location?

A. It was original location.

Q. Okay. And then what appears to be a hole next to the dishwasher here in the same --

A. They were cabinets with like drawers and a cabinet.

Q. Okay. But in this photograph, there's no drawers, so did you have drawers here or not?

A. Before. But for awhile, I had kept -- like I installed the sort of like -- not drawer, but like a


PLAINTIFF'S EXHIBIT PL103-136

panel the size of that, that it opens up now, like a few weeks ago. So -- but like, yeah, it was open for a while, I guess.

Q. Okay. And going back to the first photograph of the table and the painting in the background, so if this was taken, you think, sometime around May or so of 2024, that's approximately when you had the painting hanging up there behind the dining room table?

A. Yeah. Yes.

Q. Okay. And do you recall when you initially placed it on that wall?

A. No.

Q. Okay.

A. I can tell you that it's been on and off on that wall for sure.

Q. Okay. By the way, do you need to take a break?

A. (Shakes head).

Q. No? Okay.

(Discussion off the record)

* * *

(LUNCHEON RECESS)

* * *

BY MR. NA:

Q. Julio, do you understand you're still under oath?

A. Yes, I do.
Q. Okay. Perfect.
So just a couple of questions regarding your finances. So at the time of the loss, were there any judgments rendered against you?
A. Do you mean if I had a pending lawsuit?
Q. So a judgment would be like you had a lawsuit and then you lost, and so a jury said, Mr. Julio Ravada, you owe X amount of money to the plaintiff.
A. Yes. One for 5,000, but that was decided over a year -- maybe a year ago, that I still haven't paid. I'm just waiting to sell everything so I can pay.
Q. Okay. Any other judgments?
A. No.
Q. What was the 5,000 judgment for? It sounds like it was a small claims matter.
A. Yeah. For kitchen -- for a custom-made kitchen stove.
Q. So you had a dispute with the retailer, I take it?
A. They sue me, yeah.
Q. All right. Any liens filed against you?
A. Them. They filed a lien against this property.
Q. Who is "they"?
A. The kitchen -- the company's called PS212.


PLAINTIFF'S EXHIBIT PL103-138

Q. Okay. And so they filed a lien for the $5,000 judgment?
A. Yes.
Q. Okay. Any others?
A. Not that I can think of.
Q. Okay. Were you in default on any loan at the time of the loss?
A. Yeah. Like my credit cards and the mortgages.
Q. Okay.
A. But I want to say something with this. Like in my -- you know, literally, like I have so much equity in each one of the homes, like what really can end all of this to me is like I need to sell one property. And it's not like -- I'm sort of like -- I haven't even considered like filing for bankruptcy. I don't want to do that because I want to pay every debtor that I owe money, you know. But I need that to happen, but the market is the way it is.
Q. Okay. So at the time of the loss, can you estimate, you know, how much you owed in terms of your total debt?
A. Including mortgages?
Q. Yeah.
A. 2 million.
Q. Okay. And that includes your mortgages and your


PLAINTIFF'S EXHIBIT PL103-139

credit cards?

A. Yeah.

Q. Okay. Did you have any property foreclosed on you at the time of the loss?

A. No.

Q. Okay. And you were not renting, so you were not evicted; right?

A. Yes.

Q. Okay. Did you ever have any -- well, not ever, but did you have any property repossessed at the time of the loss?

A. No.

Q. And you just said you did not declare bankruptcy; correct?

A. Correct.

Q. Okay. And then I think you said you had refinanced two or three of your mortgages?

A. Well, no. I applied remodified.

Q. Remodified?

A. And the other two are in the process and two are already approved.

Q. Okay. Did the banks ever, you know, initiate any either foreclosure actions or collection actions?

A. Only American Express was getting a little like on the side of like wanted to sue me and go to court and

all of that. And what I did with them is I agreed to like a payment plan basically.

Q. Okay.

A. Yeah.

Q. And how much do you owe American Express?

A. Like 60,000.

Q. And what is your monthly payment plan?

A. 2200, I believe.

Q. Okay. Were any of the items that you're claiming in this loss pledged as collateral for any loans?

A. Just the damages to the house, I guess; right?

Q. Okay.

A. But that's it. No.

Q. Okay. In terms of your income from the job that we described or that we discussed earlier with your rental income and then your job as the tester for Bank of America, what would you say your monthly income is --

A. 25,000.

Q. -- combined?

A. 25,000.

Q. And what is your income just from the bank?

A. 9700 a month.

Q. Okay. Do you have any car payments?

A. No. No. I mean, I had four cars. Two, I got

rid of, and then the other two are -- I gave them to a friend of mine that he's using them for personal use and he pays them. So I don't -- I don't have a car or a car payment.

Q. Okay. So you currently own two cars?

A. Yeah. My business does; not me. But they're under the business.

Q. Okay. And one of those two cars, a friend is making the payment?

A. Yeah. He's had it for a year and a half now, and he's paying it.

Q. And the other car, are you making payments or is it paid off?

A. What other car? He has the two of them.

Q. Oh. He has both of them?

A. Yeah.

Q. So you have no cars right now?

A. Right. I use Uber Eats.

Q. Do you have auto insurance payments then?

A. No, not today.

Q. Okay. And so other than the occupation that we discussed earlier, you have no other source of income; is that correct?

A. That is correct.

MR. NA: Okay. The next document, this is --

okay. This will be Exhibit 7.

(Exhibit 7, remotely introduced and provided electronically to the reporter)

BY MR. NA:

Q. And what I have here I believe is the email exchange between you and the artist for the painting.

A. Yes.

Q. Okay. Can you see this screen, or do I need to enlarge it?

A. I'm good.

Q. Okay. So the only question that I had was with respect to the photograph that was attached to these emails. Let me get it real quick.

So this photograph here on Page 4 of this 10-page document, was this taken at the Palm Springs property.

A. That's a hundred percent from my Reseda property.

Q. Okay. And when was this photo taken, do you recall?

A. I have to guess. It would be sometime in 2021.

Q. Okay. So it looks like you sent this photograph to the artist and I guess his name is Mark?

A. Yeah.

Q. Okay. Mark. Because he had asked you for a

copy or asked for a photograph of the painting.
A. Yes.
Q. Okay. Why did you send him this one instead of the photograph that you have of the photo from Palm Springs?
A. He asked me for a picture of the painting, and then I go to my photo app and I just was like searching through, and then that's -- because I have like a million apps like, you know, and that one came up first. No particular reason. I -- it was a random picture whatever came first when I was browsing through.
Q. But didn't you have one that you took in May with the black table at the Palm Springs property?
A. That is correct. But he was not asking me specifically to send the latest picture that you have.
Q. I'm just wondering why you would send a photograph of your prior property photo as opposed to the current property where the loss occurred?
A. Well, doesn't -- I don't understand why not. Like the way that it worked was that when he asked me to send him a picture, I just went into my phone. And then I, you know -- I thought I can, you know -- like if I put "search painting," nothing would come up. And so then I put "Reseda," because I wouldn't put in Palm Springs, and pictures of that would come up in my living room. No

particular reason. That's what came up when I was searching through.

Q. Okay. Let me show you this real quick; okay? This is the photograph that I'm referring to; right?

A. The one taken in May, yes.

Q. Okay. So let me ask you this then. What was the purpose in taking this photograph?

A. So I don't remember. The purpose of me sending that specific picture to you guys was because like when the guy -- the adjuster called me and then he said something like, "Hey, I want you to take a picture of the hole in the wall because you haven't included it in the repairs, so I want to make sure that you get fully paid for everything," so at that moment, I knew that he was lying or he was like --

Q. I'm sorry. That's not what I'm asking. I'm asking why did you take this photograph in May?

A. Because I had been -- I guess I had just finished the -- what do you call this? -- the dining table. So I wanted to like send it to a friend maybe and then to like get feedback.

Q. What do you mean you finished the dining table?

A. Because I'm the one who did the painting or the black epoxy, so like I thought like it would look cool. That's why I put -- you're asking me for something

specific right now on something I do every day. I do things here in the house, and anytime I finish, I take a picture and then I like send it to my friends.

Q. Again, I'm asking you what was the purpose of taking this photograph in May? Because I think you had said you changed the color in June.

A. No, I didn't say that. I changed the color -- the black epoxy work, I probably did it sometime around the time when I took this picture. And then after that, I realized that I didn't like it, so then I went and changed it to gray, which is what it is right now. So I changed it to gray in June, but prior to that, it was gray, and I had changed it to black.

Q. So are you saying it was gray before it was black, and then you changed it back to gray?

A. Yes.

Q. Okay. So then when was it gray before it was black?

A. I will have to look at my pictures and then tell you. You're asking me specifics that I don't remember. But I have like resurfaced this dining table at least six times in the last year like. Yeah.

Q. Okay. So if we go back to your email to Mark --

A. Yeah.

Q. -- that was sent on July 1st --


PLAINTIFF'S EXHIBIT PL103-146

A. Yeah.
Q. -- it looks like. So wouldn't this picture be the first one in your phone? And again, I'm just trying to understand how it is that you would send him a picture that you took in your property in Reseda, which was taken back in 2018 or so, when you've got an earlier picture on your phone.
A. Right. Because --
Q. I'm trying to figure that out.
A. -- I take like 20 to 30 pictures every day. And then in all of my pictures -- I have 20 to 30 pictures a day for the last 7 years, so that's a lot of pictures. And I have them basically also like separated in folders and whatnot. So I guess at that moment -- even if somebody were to ask me today, "Hey, send me a picture of the painting," I would think of first, like how can I search it on my phone? Let me search Reseda, because I know if I put "Reseda," a lot of the pictures of the house are going to come up. And I remember taking a lot of pictures of this painting.
But while I've been here, the painting was not really like the main subject of any thought in my head ever like as it was in Reseda.
Q. So, for example, did you post this picture that you took in -- you know, with the dark -- the black table


PLAINTIFF'S EXHIBIT PL103-147

here -- I don't know if you have any social media accounts, but did you post it on social media by any chance?

A. I have social media, and I have not used it in over two years. I am finished -- what I do is I take pictures and I send it -- I have two best friends, and I send them pictures of everything, what I do daily. So I'm pretty sure I sent to one of them, so like "Tell me what they think," or whatever. But that's all I do with pictures.

Q. Okay. So let me ask you this. So when this photograph, which was part of Exhibit 6 to your transcript, of this dining room table was taken -- and I'm not sure you answered this question -- but, again, what was the purpose of taking this photograph?

A. Because I was done with like doing the epoxy, the black epoxy, and I wanted to probably send it to a friend. That's why if I see that little ball, like it's in the bottom, like the way I positioned it was because I wanted to like -- I was done with the table and I wanted to send it to a friend and I asked them tell me what they think. I was probably done doing the black epoxy.

Q. So you're saying that this was to see how it looked after you were done?

A. To impress my friends to be validated because I


PLAINTIFF'S EXHIBIT PL103-148

was happy it was done finally, and for them to tell me what they thought.

Q. Do you recall who you sent it to?

A. No, I do not. But I send stuff to -- like I said, I have two best friends and I have my mom. I don't remember -- I had a fight with her, but I used to send her pictures all the time of like things that I do. So I can think of my friends, two of my friends, or probably my mom.

Q. Okay. And you would have sent those by text, I would imagine?

A. Yeah.

Q. Okay. Do you think you can find those texts and send me the screenshots?

A. It's possible. Without a doubt, yes.

Q. Okay.

A. My phone arrives tomorrow. That's basically where the confirmation is, so I'll be able to send that.

Q. Okay. Great. I would appreciate that.

A. Absolutely.

MR. NA: Okay. And then one final document I wanted to show you. Okay. This will be Exhibit 8. And this is a printout that I obtained from Zillow.com. It's a listing of your Palm Springs property.

///

(Exhibit 8, remotely introduced and provided electronically to the reporter)

BY MR. NA:

Q. Do you recognize this?

A. Yes.

Q. So I just want to kind of go over some of the photographs that were listed here or included in this listing, I should say. So starting with this photograph -- and I'm assuming this is the living room looking out towards the backyard -- do you recall when this photograph was taken?

A. I do not.

But I want you to notice one thing. If you look at the pictures, because once the photographer sent the pictures that had been taken, if you notice the first one that you're looking at now, if you notice the yellow, the background and everything, those were the ones that I went and told the agent, "Hey, I have these pictures. Add them as well."

So the ones that you see, the second and third picture, they're a little bit wide at the end, those are the one given by the photographer.

Q. Thank you for that. Well, let me ask you this. When was this listing put up? When did it go into effect?


PLAINTIFF'S EXHIBIT PL103-150

A. I think July. So what is today? It's November. I mean --

Q. No. Today's September.

A. So if the contract finished yesterday, we had a 60-day contract, so that must have been two months ago. So July 27th -- 26th when it was listed.

Q. So the end of July approximately?

A. Yes, sir.

Q. Okay. And when were these photographs taken? Were they taken at the same time?

A. So the photographer came twice. I want to say maybe a week or two weeks prior.

Q. Okay.

A. The red picture was taken by me.

Q. Okay. So again, like this photograph here, the first one of the living room looking out towards the backyard showing the pool, this photograph is something that was taken approximately a week or two before the listing went up in July --

A. No.

Q. -- 20 -- no?

A. No. That picture wasn't taken by the photographer. That's my picture.

Q. Okay. This is your picture?

Okay. And do you know when you took this


PLAINTIFF'S EXHIBIT PL103-151

picture then?
A. It was this year, but I -- maybe May, June this year.
Q. Okay. Let me ask you this. The listing in July of 2024, was that the first time you listed this property?
A. No.
Q. Okay. When was the first time you listed the property?
A. The first time must have been April or May of this year, I listed the property.
Q. Okay. And so were these photographs the same photographs that you used during all the listings?
A. No.
Q. Or did you take new photographs for each listing?
A. For the first listing in April or May, the pictures posted were all taken by me.
Q. Okay.
A. And in July, that's when a professional photographer was sent and the ones with the white background are his. The other ones are mine.
Q. So moving on, these photographs from the bottom here, one showing the kitchen and one showing the bedroom, those are your photographs or the


PLAINTIFF'S EXHIBIT PL103-152

photographer's?

A. The photographer's.

Q. Okay.

A. The better picture is also like digitally edited. The bed is not like that. He did -- that bedding, all you see is all staged by him online.

Q. Okay. In the bottom left here, the photograph of the kitchen with the island in the foreground and then the four stools in the left-hand corner, do you see there's a shelf unit that we talked about earlier? Do you see that?

A. Yes.

Q. Okay. And then the items inside there, those are all the same items that we saw in that photograph that we discussed; correct?

A. Yes.

Q. So are those items still there right now?

A. Yes.

Q. So this photograph of the kitchen is the way it -- scratch that. Never mind.

Okay. Moving onto the next page, the photographs of the backyard. Are these photographs from the photographer or from you?

A. Photographer.

Q. Okay. The next page, another view of the living

room, actually three photographs of the living room in different lights. The first one here on the top, the big one, is that the photographer or is that from you?
A. That's the photographer.
Q. Okay. And here, the dining room table here is gray; correct?
A. Yes.
Q. Yes?
A. Yes.
Q. Okay. And then in the background, there's a painting.
A. Yes.
Q. Okay. When was this photograph taken?
A. The same, the end of July, with a professional photographer.
Q. Okay.
A. The red one is mine.
Q. Oh, the red one in the bottom?
A. The red one, that was taken by me.
Q. Okay. Moving to the next photograph, this appears to be photographs of the bedroom.
A. Yes. The bottom left is taken by me. The other two, photographer. No, I'm sorry. The two bottoms taken by me and the one above, the photographer.
Q. The one on the bottom left, that's the bathroom?

A. Yes.
Q. And is that the master bathroom?
A. No. That's the guest bathroom where they entered through.
Q. So is that the sink that you were saying earlier that you had replaced?
A. Yes.
Q. Or not replaced, but remodeled in the bathroom?
A. Well, I had it -- yeah, that, I had replaced. Like I bought a new one and that one was put instead.
Q. Okay.
A. So more than two years ago.
Q. Okay. And then the photos below or the next photos, those are the master bedroom?
A. Bedroom and -- yes, that's all professional photographer.
Q. Okay. The next set of photographs, is that also from the master bedroom?
A. Yeah. The top one was taken by me. The two bottom, photographer.
Q. Okay. And then the next set of photographs, backyard and the garage?
A. The garage. And the one on the top was taken by me.
Q. Okay.

A. Oh, three -- actually three of them were taken by me.

Q. This garage door here, is this the garage door that you were referencing earlier that you had left open when Robin walked in?

A. Yes, sir.

Q. Okay.

A. I'm sorry. So you see how I had it posted, it's February 8th.

Q. Okay. Is that the first time you had it listed?

A. Yes.

Q. And when you listed it on February 8th, did you use an agent or did you list it yourself?

A. No. I used an agent. And all the pictures used were taken by me.

Q. And the same thing with the listing in July 25th, that was also with an agent?

A. That was listed by the current agent where that ended yesterday.

Q. Okay. And for both of the listings, did you use the same agent or did you use different agents?

A. Different agents.

Q. Okay. And that was Exhibit 8.

MR. NA: Okay. Let's take a quick five-minute break.

(Recess)
BY MR. NA:
Q. Do you understand you're still under oath?
A. Yes
Q. Okay. So I just quickly want to go over a couple more photos. I'm not going to attach this as an exhibit because it's rather lengthy. I did want to go over them with you real quick.
So what you should see on the screen, I will represent to you are photographs that were taken by my client during a site inspection on June 6th, 2024 at the Palm Springs property. I believe you were there. You must have been there.
A. Yes.
Q. Okay. So it's 118-page document. Again, I'm not going to go through all of them, but it's got photographs taken by the adjuster at the time of the inspection, and so it shows the condition of the property on that date.
So here, with reference to Page 7 of this document, that shows -- is that the washer and dryer?
A. No. It's the dishwasher.
Q. I'm sorry. The dishwasher. I'm sorry.
So is that the bottom part of the dishwasher that was pulled out?

A. Yes.
Q. Okay. And again, that has not been replaced, but you were able to put it back in. What is the current condition of the dishwasher?
A. So I am the one that pulled out that drawer because I noticed that it had -- the entire dishwasher was chipped on the sides. And then the drawer was open slightly, so when I opened it more, because there was water also coming from there, I noticed that there are three different conducts going inside from that drawer, and one of them was like cut off, which I think is the water one. So that basically, I was able to place the drawer back, but I have not used the dishwasher at all since then or replaced it or nothing.
Q. Okay. But I'm sorry. Did you say you're the one that pulled out the drawer?
A. Yes.
Q. Okay. And the next photograph on Page 8, that shows the interior of where you pulled the drawer out on the dishwasher; is that correct?
A. Yeah.
Q. Okay. Page 15, I think it's a view of your living room and the dining room. And in this photograph, the dining room table, that color is gray?
A. Yeah.

Q. Okay. So this is after you had, I guess, changed it back from being black to gray?

A. Yes.

Q. Okay. So on the date of the loss, you said you were -- while you were waiting for Edward, you said you were redoing something to the table?

A. Sanding it.

Q. You were sanding it? Okay. So was that in preparation from changing it to black from this gray color that's shown here?

A. No. It was already -- it had already been resurfaced. Once it was resurfaced, then I started sanding it.

Q. Okay. So when you were sanding it, what color was it?

A. Gray.

Q. Okay.

A. Yeah, I was sanding it, so it could be like very smooth. Like 220-grid sanding paper.

Q. That's fine. I'm just trying to get some more clarity on the color of it.

So it used to be black --

A. Yes.

Q. -- right?

It was black in May of 2024 --

A. Yes, sir.
Q. -- right?
And then you changed it back to this current color of gray?
A. Yes.
Q. Okay. And on the date of the loss, on June 3rd while you were waiting for Edward, you said you were doing something to this table.
A. After changing it to gray color, like once it was changed, then I started sanding it so it could have this very smooth look.
Q. Okay.
A. And I bought a sealer and then I added the sealer.
Q. Okay. So when did you change it back to gray? What date?
A. June 2nd.
Q. Okay. And then on the date of the loss, you were sanding it?
A. Yes.
Q. Okay.
A. After applying that coat, I was sanding it so it could have a very smooth finish.
Q. Okay. Understood.
And this is the step down that you were talking


PLAINTIFF'S EXHIBIT PL103-160

about in the living room?
A. That's the sunken. And what you're pointing at is basically the one that stops you from not falling over.
Q. I should point to what area? I got you. All right.
Okay. Here on Page 26, this photograph of this item on the wall, is that one of the controllers?
A. No. That's a light switch that I put.
Q. Light switch. Okay. And that's part of the claim?
A. No.
Q. No?
A. No.
Q. Okay. Starting on Page 49 of 49 appears to be a photo of the bathroom. Is this the bathroom where --
A. They had broken through.
Q. -- you think they broke in? Okay.
A. And that's the window where they came through.
Q. Okay. So continuing on. So this photograph -- just so that the record is clear, there were two sets. Set 1 is the one we just finished reviewing, and then there's a Set 2, Inspection Photos, again taken on June 6, 2024.
This is another photo of the bathroom; is that

correct?
A. Yes, sir.
Q. Okay. And this window in the background, that's the one that you're saying needs to be replaced?
A. Yes.
Q. And this toilet here, that's the one that needs to be replaced?
A. Yes.
Q. Okay. And with respect to the mold testing, it's required on the walls here or exactly where is the mold testing required?
A. Where the toilet is, it's attached to.
Q. Okay. So let me see. Okay. So Page 5 of this second set shows the toilet attached. Do you see any mold here?
A. Not at the bottom. Like the entire toilet tank and everything, connection, plumbing and all of that is behind the wall.
Q. Okay.
A. It's not the floor.
Q. Okay. Let me see. So Page 6 is another photograph of the toilet. Any mold here?
A. Not that I can see.
Q. Okay. And then Page 7, that's a photo of the window. Let me see if there's a closeup of the window.

Another toilet picture. Well, Page 10 shows the interior of the toilet. What is the current condition of the toilet now? Is that the way it looks right now?

A. I mean, so when the -- after that, the agent posted this house for sale, sent a cleaning crew to clean the house, and they cleaned the toilet. But they did not -- so that area, everything that you see right now how dirty it is, it's not Number 1 or Number 2. It's something, and they came and cleaned it and still, the bottom shows like a black something.

Q. Okay. Well, so like this -- I'm assuming this is the bathtub that's in the same bathroom?

A. Yeah.

Q. And this is Page 19 of the photos. Was that something that you put in?

A. So this is what I told you that the tiles were removed. Instead of adding new tiles -- because I didn't have money -- I just had it done like smooth surface. But I mean, that bathtub has never been used. Like, you know, it --

Q. Okay. So if I understand correctly, this bathtub used to have tiles, but you removed the tile and then you resurfaced it with this current -- is it cement? Concrete?

A. Isn't that the same?


PLAINTIFF'S
EXHIBIT
PL103-163

Q. I'm sorry?
A. Isn't that the same?
Q. Well, I'm trying to figure out what the substance is.
A. Well, I thought cement or concrete is the same. But it's cement like.
Q. Okay.
A. But it's finished cement and then it's sealed, so water -- like you can take a shower there, but I mean --
Q. Okay. But that's something that you did; correct?
A. That I had done.
Q. Right. Okay. Photos of the backyard.
So Page 35 appears to be where the electrical panel is; is that correct?
A. No. That's not to -- the electrical panel is right outside.
Q. Okay.
A. That's the water heater closet.
Q. Oh. Gotcha.
All right. And Page 38, that's the camera that was damaged?
A. Yeah.
Q. Okay. And then here in the background, is that

the cover for the electrical panel?
A. Yeah. And then at the end, you see the steps that they put in there to go through the window.
Q. You mean this red bucket here (indicating)?
A. Yeah.
Q. Okay. Page 40 is a closeup of the panel cover on the ground; correct?
A. Yes.
Q. Okay. 41, another shot of the panel on the ground. And 44, Page 44, is a closeup of the electrical panel. Let me zoom in on this.
So again, other than the master switch being turned off, was there any other damage that was done to the panel?
A. So the master switch is at the top.
Q. Okay.
A. It's not where you were like circling around. So that one is gone right now. It's all gone.
Like other damages? No. But I don't know why like before when I used to be able to like turn that off, like the entire house doesn't turn off. But after like switching it back on, like long time ago, it just came undone.
Q. Okay. Moving on.
A. That's it.

Q. Yeah. So Page 48 is a photo of the bathroom window from the outside; correct?

A. Yes.

Q. Okay. 49 is a closeup of what appears to be the bottom frame of that same window?

A. That's what -- that, they made. That hole that you see right there, that is how they opened the window. I don't know how.

Q. All right. So you're pointing to this hole that was made on the frame of the window?

A. Yeah.

Q. Okay. And so is the theory that they were somehow able to open the window by somehow using this hole here (indicating)?

A. By somehow making that hole and doing something there to be able to open the window.

Q. Okay.

A. I don't know how.

Q. Okay. And then that's Set 3 of the photographs taken on June 6, 2024. It's a closeup of that same hole in the same window?

A. Yes.

Q. Okay. Page 3, I think, is the other side of the window. And the other side of the window frame was not damaged; correct?

A. Not that I know. I didn't know about that other hole. Like maybe -- yeah. Huh.

Q. Okay. And then Page 4 shows -- I guess it's a crate that was used.

A. That was inside the shed.

Q. Okay. And then the rest of the photos, I think, are either duplicates or other parts of the property.

That's the card that you got from the police on Page 15.

A. Yes.

Q. Okay. So again, this is a 118-page document. I am not going to attach that as an exhibit. I just wanted to go over it with you.

MR. NA: Okay. That concludes my examination of you today.

THE WITNESS: Okay.

MR. NA: To the extent the insurer obtains additional information that requires a continuation of your examination, I'm going to reserve the carrier's right to do so. I'll let you know, obviously, if that is the case and if we need to continue your examination.

With respect to today's proceeding, the transcript will be prepared by the court reporter. It will be sent to you by email. I typically give the insureds 30 days to review the transcript to make sure


PLAINTIFF'S EXHIBIT PL103-167

it's accurate. If you need more time, let me know. And certainly, if you can get it done before then, you know, then get it to me before the 30 days.

Keep in mind, you'll be signing the transcript under penalty of perjury. Also keep in mind that any changes made to the transcript, if it's deemed to be material, it could be potentially damaging to your claim.

Other than that, we are done and we are off the record.

THE WITNESS: Thank you.

(The deposition concluded at 2:42 p.m.)

* * *

DECLARATION UNDER PENALTY OF PERJURY

I, Julio Ravada, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on September 27, 2024; that I have made such corrections as appear noted on the Deposition Errata Page, attached hereto, signed by me; that my testimony as contained herein, as corrected, is true and correct.

Dated this 16th day of OctoberP, 2024 at 2275 E Belding DR Palm Springs, California.

Julio Ravada



PLAINTIFF'S EXHIBIT PL103-169

DEPOSITION ERRATA SHEET

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

Page No.__________ Line No. __________

Change:________________________________________________________

Reason for change:_____________________________________________

______________________________________ ______________________
Julio Ravada Dated



PLAINTIFF'S EXHIBIT
PL103-170

STATE OF CALIFORNIA )
)
COUNTY OF SAN DIEGO )

I, Renée C. Fritz, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken remotely before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in any way interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: October 7, 2024

___________________________________
Renée C. Fritz
CSR No. 6910



PLAINTIFF'S EXHIBIT
PL103-171

| | | |
|---|---|---|
| Arrest [ ]<br>Crime [x]<br>Non-Criminal [ ] | **Palm Springs PD**<br>200 S. Civic Drive<br>CA0331100<br>**CR-1** | CASE# **2406P-0608**<br>PAGE **1** |

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | DATE AND TIME REPORTED | MORE CHARGES | ESTIMATED LOSS VALUE |
|---|---|---|---|
| 06/03/24 12:30 Monday TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 | YES [ ] NO [X] | $18,800.00 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

## PERSONS

Codes: V = Victim W = Witness C = Complainant P = Parent G = Guardian R = Party O = Other

MORE NAMES YES [ ] NO [X]

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | RESIDENCE | CELLULAR |
|---|---|---|---|---|
| V | 1 OF 1 | Ravada, Julio | 2275 Belding Dr , Palm Springs, CA 92262 | (213) 925-4069 |

| OCCUPATION | RACE | SEX | AGE | DOB | ADDRESS 2 | PHONE 2 |
|---|---|---|---|---|---|---|
| | O | M | 39 | 11/20/1984 | | |

| DL | STATE | SS# | INJURIES | ADDRESS 3 | PHONE 3 |
|---|---|---|---|---|---|
| D6382641 | CA | | | | |

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | ADDRESS 1 | PHONE 1 |
|---|---|---|---|---|
| | OF | | | |

| OCCUPATION | RACE | SEX | AGE | DOB | ADDRESS 2 | PHONE 2 |
|---|---|---|---|---|---|---|
| | | | | | | |

| DL | STATE | SS# | INJURIES | ADDRESS 3 | PHONE 3 |
|---|---|---|---|---|---|
| | | | | | |

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | ADDRESS 1 | PHONE 1 |
|---|---|---|---|---|
| | OF | | | |

| OCCUPATION | RACE | SEX | AGE | DOB | ADDRESS 2 | PHONE 2 |
|---|---|---|---|---|---|---|
| | | | | | | |

| DL | STATE | SS# | INJURIES | ADDRESS 3 | PHONE 3 |
|---|---|---|---|---|---|
| | | | | | |

## CASE SUMMARY / VEHICLE INFORMATION

SUMMARY

**Unknown suspects forced entry and removed items from Julio Rodolfo Ravada's home (2275 Belding Drive) without his knowledge or permission.**

| VEHICLE USED IN CRIME | | LICENSE (NO. AND STATE) | YEAR | MAKE | MODEL | BODY TYPE | COLOR | VIN | MORE VEHICLES |
|---|---|---|---|---|---|---|---|---|---|
| YES [ ] NO [ ] UNK [ ] | OF | | | | | | | | YES [ ] NO [X] |

| TOW REPORT | GARAGE NAME AND PHONE | REGISTERED OWNER | R/O ADDRESS |
|---|---|---|---|
| YES [ ] NO [ ] | | | |

## SUSPECT(S) / ARRESTEE(S)

Codes: S = Suspect A = Arrestee D = Detainee SV - Suspect/Victim AV - Arrestee/Victim DV - Detainee/Victim

MORE NAMES YES [ ] NO [X]

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | ADDRESS 1 | PHONE 1 |
|---|---|---|---|---|
| S | 1 OF 2 | Unknown, | | |

| RACE | SEX | HT | WT | HAIR | EYE | AGE | DOB | ADDRESS 2 | PHONE 2 |
|---|---|---|---|---|---|---|---|---|---|
| W | M | | | | | | | | |

| OCCUPATION | INJURIES | ADDRESS 3 | PHONE 3 |
|---|---|---|---|
| | | | |

| SCARS / MARKS / TATTOOS | AKA's | | ARRESTEE DISPOSITION | RELEASE LOCATION | ARREST DATE TIME |
|---|---|---|---|---|---|
| YES [ ] NO [ ] | | | | | |

| DL | STATE | ARRESTED | BOOKING # | WARRANT | CITATION # | SS# | CII# |
|---|---|---|---|---|---|---|---|
| | | YES [ ] NO [X] | | YES [ ] NO [X] | | | |

CHARGES

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | ADDRESS 1 | PHONE 1 |
|---|---|---|---|---|
| S | 2 OF 2 | Unknown, | | |

| RACE | SEX | HT | WT | HAIR | EYE | AGE | DOB | ADDRESS 2 | PHONE 2 |
|---|---|---|---|---|---|---|---|---|---|
| W | M | | | | | | | | |

| OCCUPATION | INJURIES | ADDRESS 3 | PHONE 3 |
|---|---|---|---|
| | | | |

| SCARS / MARKS / TATTOOS | AKA's | | ARRESTEE DISPOSITION | RELEASE LOCATION | ARREST DATE TIME |
|---|---|---|---|---|---|
| YES [ ] NO [ ] | | | | | |

| DL | STATE | ARRESTED | BOOKING # | WARRANT | CITATION # | SS# | CII# |
|---|---|---|---|---|---|---|---|
| | | YES [ ] NO [X] | | YES [ ] NO [X] | | | |

CHARGES

## ADMINISTRATION

| VICTIM DESIRES PROSECUTION | FOLLOW-UP | COPIES TO: |
|---|---|---|
| YES [X] NO [ ] | YES [ ] NO [X] | [ ] Pat [ ] Det [ ] DA [ ] Court [ ] VWAP [ ] Probation [ ] OTHER: |

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/24 16:41 | M. Torres 16035 | 06/12/24 |

| OFFICER | UNIT/SHIFT | ASSIGNED TO |
|---|---|---|
| Corder, Logan | | |

PLAINTIFF'S EXHIBIT PL103-172

| | |
|---|---|
| Arrest | [ ] |
| Crime | [x] |
| Non-Criminal | [ ] |

**Palm Springs PD**
200 S. Civic Drive
CA0331100

# Property and Evidence

CASE #
2406P-0608



| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED | TOTAL PROPERTY VALUE |
|---|---|---|---|
| 06/03/24 12:30 Monday | TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 | $18,800.00 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

## PROPERTY ITEMS

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-001 | S | 3 | GLD | | | Gold | Chians | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,000.00 | $3,000.00 | |

DESCRIPTION: Mens gold chain taken from location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-002 | S | 1 | | | | | Desk lamp | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,000.00 | $1,000.00 | |

DESCRIPTION: Desk lamp taken from location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-003 | S | 1 | | | | | Vaccum cleaner | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,000.00 | $1,000.00 | |

DESCRIPTION: Vaccum cleaner taken from location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-004 | S | 1 | | | | Light | Fixtures | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $2,000.00 | $2,000.00 | |

DESCRIPTION: New light fixtures taken from property — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-005 | D | 1 | | | | Window | Repair | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,000.00 | $1,000.00 | |

DESCRIPTION: Repair for damage done to window — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-006 | S | 1 | BLK | | | Boa | Laptop | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,000.00 | $1,000.00 | |

DESCRIPTION: Laptop stolen from location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-007 | S | 1 | | | | Custom | Artwork | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $5,000.00 | $5,000.00 | |

DESCRIPTION: Artwork stolen from the wall of the location — [ ] FIELD RECEIPT ISSUED

## ADMINISTRATION

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/24 16:41 | M. Torres 16035 | 06/12/24 |

| OFFICER | UNIT/SHIFT | ASSIGNED TO | C |
|---|---|---|---|
| | | | |



PLAINTIFF'S EXHIBIT PL103-173

| | |
|---|---|
| Arrest | [ ] |
| Crime | [x] |
| Non-Criminal | [ ] |

# Palm Springs PD

200 S. Civic Drive

CA0331100

## Property and Evidence

CASE # 2406P-0608

Page 2 of 3

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED | TOTAL PROPERTY VALUE |
|---|---|---|---|
| 06/03/24 12:30 Monday | TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 | $18,800.00 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

### PROPERTY ITEMS (cont'd)

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-008 | S | 1 | BLK | | | M1 | Laptop | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,300.00 | $1,300.00 | |

DESCRIPTION: Laptop stolen from desk at location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-009 | S | 1 | | | | Phone | Headset | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $100.00 | $100.00 | |

DESCRIPTION: Headset stolen from desk — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-010 | S | 1 | | | | Quad | Drone | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,200.00 | $1,200.00 | |

DESCRIPTION: Drone stolen from living room of location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-011 | S | 1 | | | | Apple | Airpods | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $200.00 | $200.00 | |

DESCRIPTION: Apple airpods stolen from desk at location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-012 | S | 1 | | | | Studio | Subwoofer/soundbar | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $1,200.00 | $1,200.00 | |

DESCRIPTION: Stolen sub/soundbar stolen from location — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-013 | S | 1 | BLK | SIL | | Google | Nest | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $300.00 | $300.00 | |

DESCRIPTION: Stolen nest thermostat — [ ] FIELD RECEIPT ISSUED

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-014 | S | 2 | | | | Brilliant | Light control boxes | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $250.00 | $500.00 | |

DESCRIPTION: Light controllers stolen from location — [ ] FIELD RECEIPT ISSUED

### ADMINISTRATION

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/24 16:41 | M. Torres 16035 | 06/12/24 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | C |
| | | | |

PLAINTIFF'S EXHIBIT PL103-174

| | | |
|---|---|---|
| Arrest [ ]<br>Crime [x]<br>Non-Criminal [ ] | ***Palm Springs PD***<br>200 S. Civic Drive<br>CA0331100<br>**Property and Evidence** | CASE #<br>2406P-0608<br>Page 3 of 3 |

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED | TOTAL PROPERTY VALUE |
|---|---|---|---|
| 06/03/24 12:30 Monday | TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 | $18,800.00 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

## *PROPERTY ITEMS* *(cont'd)*

| ITEM # | STATUS | QUANTITY | COLOR | COLOR 2 | TYPE | MAKE | MODEL | YEAR |
|---|---|---|---|---|---|---|---|---|
| 16555-015 | E | 1 | | | | Digital | Footage | |

| SERIAL NUMBER | BAR CODE | VALUE | TOTAL | LOCATION / BIN # |
|---|---|---|---|---|
| | 2406P-0608 | $0.00 | $0.00 | Digital Evidence Upload Folder |

| DESCRIPTION | [ ] FIELD RECEIPT ISSUED |
|---|---|
| Digital footage of suspects in backyard of home | |

## *ADMINISTRATION*

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/24 16:41 | M. Torres 16035 | 06/12/24 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | C |
| | | | |



PLAINTIFF'S EXHIBIT PL103-175

| | | |
|---|---|---|
| Arrest [ ]<br>Crime [x]<br>Non-Criminal [ ] | **Palm Springs PD**<br>200 S. Civic Drive<br>CA0331100<br>**Person Profile** | CASE # **2406P-0608**<br>PAGE 1 OF 1 |

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | DATE AND TIME REPORTED |
|---|---|
| 06/03/24 12:30 Monday TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

## PERSONS

Codes: V = Victim W = Witness S = Suspect A = Arrestee D = Detainee C = Complainant R = Party O = Other

MORE NAMES YES [ ] NO [ ]

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | DOB | |
|---|---|---|---|---|
| S | 1 OF 2 | Unknown, | | This report contains Person Profile information only. Please refer to the primary report(s) for additional information. |

CLOTHING

No shirt dark pants blue facemask

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | DOB | |
|---|---|---|---|---|
| S | 2 OF 2 | Unknown, | | This report contains Person Profile information only. Please refer to the primary report(s) for additional information. |

CLOTHING

Blue shirt dark shorts black shoes

| CODE | | NAME - LAST, FIRST, MIDDLE, SUFFIX | DOB | |
|---|---|---|---|---|
| V | 1 OF 1 | Ravada, Julio | 11/20/1984 | This report contains Person Profile information only. Please refer to the primary report(s) for additional information. |

MO INFORMATION

**Resident Status of Victim**
Resident

**Type of Injury**
None

**Type of Victim**
Individual

**Victim Connected to UCR Offense Code**
459 - PC; Burglary; Felony

CLOTHING

## ADMINISTRATION

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/24 16:41 | M. Torres 16035 | 06/12/24 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | |



PLAINTIFF'S EXHIBIT PL103-176

| Arrest | ☐ | Palm Springs PD<br>200 S. Civic Drive<br>CA0331100<br>**Narrative Report** | CASE #<br>2406P-0608 |
|---|---|---|---|
| Crime | x | | Page 1 of 3 |
| Non-Criminal | ☐ | | |

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED |
|---|---|---|
| 06/03/24 12:30 Monday | TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

NARRATIVE

BODY WORN CAMERA (BWC) and IN-CAR CAMERA (ICC):
I activated my department issued BWC during this investigation. I am assigned as a Community Services Officer (CSO) for Palm Springs Police Department (PSPD), that being the case CSO vehicles are not equipped with in car cameras (ICC). All footage was uploaded to the Watch Guard evidence library.

SUMMARY:
Unknown suspects forced entry and removed items from Julio Rodolfo Ravada's home (2275 Belding Drive) without his knowledge or permission.

DETAILS:
On 06/04/2024 I was working as a uniformed Community Services Officer on patrol in the City of Palm Springs, in the County of Riverside. At approximately 0949 hours I was dispatched to 2275 Belding Drive in reference to a residential burglary. 2275 is a single-family home located on the south side of the street. The home has three main entry points, the front door, the garage, and a large sliding glass door at the rear of the house.

Upon arrival I contacted Julio Ravada who identified himself verbally and later with his California drivers license. Ravada also stated he was the owner of the residence. The following is a summary of the statement he provided to me.

Ravada stated the on 06/03/2024 he and a friend left Ravada's home (2275 Belding Drive) for a one day road trip to Los Angeles at approximately noon. Ravada stated upon returning home at approximately midnight on 06/04/2024 he found the power to his home was off. Ravada stated he did not immediately think anything was wrong due to the home being under a significant remodel. Ravada stated upon further inspection, he found the door to the home's electrical breaker box to be taken off and thrown to the ground, as well as the breaker box itself to have been tampered with. Ravada stated he also found that the bathroom window, located approximately seven feet north of the breaker box was ajar. Ravada stated at the point he became suspicious and began taking an inventory of his home. Ravada stated he found multiple items missing, those items included;
3- Men's gold chains
1- Desk lamp

***ADMINISTRATION***

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/2024 16:41 | M. Torres 16035 | 06/12/24 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | C |
| | | | |

PLAINTIFF'S EXHIBIT PL103-177

| | | | |
|---|---|---|---|
| Arrest [ ] Crime [x] Non-Criminal [ ] | **Palm Springs PD** 200 S. Civic Drive CA0331100 **Narrative Report** | CASE # 2406P-0608 | Page 2 of 3 |

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED |
|---|---|---|
| 06/03/24 12:30 Monday | TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

NARRATIVE

1- Vaccum cleaner
Light fixtures
1- Boa Laptop
1- piece of custom artwork
1- M1 maptop
1- Headset
1- Quad rotor drone
1- Apple Airpods
1- Subwoofer/soundbar
1- Google Nest
2- Brilliant light controllers

Ravada stated that the window used for entry was damaged as well as a camera on the eastside of the house, Ravada estimated the repair cost to be approximately $600.99 USC. Ravada did not have specific values or serial numbers for the list of stolen items but estimated the total loss to be approximately $18,000.00 USC. Ravada stated the property was equipped with security cameras but he did not have access at the moment due to Spectrum internet doing repairs on the property.

Ravada stated that he is desirous of prosecution against anyone apprehended in this case. I provided Ravada with a report number and my contact information should he need to reach me later and to provide me with any security footage he is able to obtain.

Ravada provided me with video footage of the suspects on 06/06/2024 via my city email address. The following is a summary of I saw on the security footage.

The first video clip starts with the camera facing Belding Drive with a timestamp of 06/03/2024 02:53:37pm approximately 5 seconds into the video a white male adult wearing no shirt and dark pants walks past the front of the home. A second white adult male walks the same directions approximately 2 seconds later wearing a blue shirt and dark colored shorts and black shoes. Both subjects leave this camera frame at timestamp 06/03/2024 02:54:06pm.

***ADMINISTRATION***

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/2024 16:41 | M. Torres 16035 | 06/12/24 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | C |
| | | | |

PLAINTIFF'S EXHIBIT PL103-178

| | | |
|---|---|---|
| Arrest [ ]<br>Crime [x]<br>Non-Criminal [ ] | **Palm Springs PD**<br>200 S. Civic Drive<br>CA0331100<br>**Narrative Report** | CASE #<br>**2406P-0608**<br>Page 3 of 3 |

| OFFENSE(S) | OFFENSE(S) cont'd. |
|---|---|
| 459 PC; Burglary; Felony; Fel. | |

| DATE, TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED |
|---|---|---|
| 06/03/24 12:30 Monday | TO 06/04/24 01:00 Tuesday | 06/04/24 03:25 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 2275 Belding Dr, Palm Springs | | | 4 | W29 |

NARRATIVE

The second clip shows both of the same subjects now in the back yard of 2275 Belding Drive. Both subjects are seen at timestamp 06/03/2024 02:54:36pm walking past the air conditioning system before leaving the frame.

The third clip shows the subject in the blue shirt at timestamp 06/03/2024 02:56:04pm walk towards the camera on the eastside of the home. He proceeds to open the door to the electrical room obscuring the camera view.

I later uploaded all footage to the evidence upload file.

This concluded my involvement in this case.

EVIDENCE:
Please see evidence tab and evidence upload file.

ADDITIONAL INFORMATION:
None.

This concluded my involvement in this case.

EVIDENCE:
Please see evidence tab

ADDITIONAL INFORMATION:
None.

***ADMINISTRATION***

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| L. Corder 16555 | 06/12/2024 16:41 | M. Torres 16035 | 06/12/24 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | C |
| | | | |

PLAINTIFF'S EXHIBIT PL103-179



PLAINTIFF'S
EXHIBIT
PL103-180




PLAINTIFF'S
EXHIBIT
PL103-181




PLAINTIFF'S
EXHIBIT
PL103-182




PLAINTIFF'S
EXHIBIT
PL103-183




PLAINTIFF'S EXHIBIT
PL103-184

Spectrum

- Home
- **Billing**
- Services
- Upgrade
- Support
- More

Chat With Us

JUNE 4

| Number | Time / Location | Annotation | Duration |
|---|---|---|---|
| ↗ (800) 556-6044 | 12:58 AM | Bank of America HR | 1 min |
| ↗ (800) 222-7511 | 1:02 AM | Bank of America Corporate Security | 2 min |
| ↗ (800) 222-7511 | 1:07 AM | Bank of America Corporate Security | 21 min |
| ↗ 911 | 3:25 AM | | 0 min |
| ↗ 911 | 3:25 AM | | 0 min |
| ↗ (800) 787-7678 | 6:50 AM | Bank of America Support Desk for Token Deactivation | 9 min |
| ↗ (800) 787-7678 | 7:11 AM | Bank of America Support Desk for Token Deactivation | 26 min |
| ↗ (818) 201-4224 | RESEDA, CA, 11:53 AM | Reseda's Listing Agent Jayson Hooshmand follow up on my cleaning the day before | 5 min |
| ↗ (323) 375-0950 | LOS ANGELES:DA 02, CA, 2:13 PM | Insight Choices Mental health clinic | 5 min |
| ↙ (323) 375-0950 | LOS ANGELES:DA 02, CA, 2:18 PM | Insight Choices Mental health clinic | 16 min |
| ↙ (818) 399-3988 | VAN NUYS, CA, 3:18 PM | Reseda's gardener to notify me gate code did not work b/c i had changed it day before so i gave him new one | 1 min |

PLAINTIFF'S EXHIBIT PL103-185

Up to 40% Off Select Tools, Tool Storage & More - Shop Now

Need Help? Call 1-866-333-3551 or Text 78465 Buy it Again

Palm Spri 10PM 92264 Menu Quotes Lists Julio Cart

Order Number: **#WM86514281** Order Total: **$1,082.89**

# Order **#WM86514281**

Placed on: Oct 30, 2024

## Billing Information

**Julio Ravada**
2275 E Belding Dr
Palm Springs CA 92262

Payment Method: VISA
***3166

| Item | Price/Item | Qty | Line Total |
|---|---|---|---|
| **Store Pickup (1 item)** | | | |
| 5200 East Ramon Road, Bldg A #8526, Palm Springs, CA 92264 | | | |
| **Item picked up from store #8526** | | | |
| **TEZA DOORS** Teza 120 Series 36 in. W x 36 in. H Universal/Reversible Matte Black Aluminum Low-E Window | $991.20 | 1 | $991.20 |
| **Available: NOV 01 - NOV 04** | | | |

| | |
|---|---|
| **Subtotal** | **$991.20** |
| Pick Up In Store | **FREE** |
| Delivery | $0.00 |
| Sales Tax | $91.69 |
| Total | **$1,082.89** |
| You Saved | $0.00 |

**Need help?**

Feedback



PLAINTIFF'S EXHIBIT
PL103-186

Case 2:25-cv-10938-SVW-AS Document 189-1 Filed 10/26/26 Page 188 of 194
Page ID #:7837

| | |
|---|---|
| Online Customer Support: 1-800-430-3376 | Call 7 days a week: 6 a.m. to 2 a.m. EST |

**How doers get more done™**

Need Help? Please call us at: **1-866-333-3551** or Text us at: **78465**

## Customer Service

Check Order Status
Order Cancellation
Return Policy
Refund Policy
Shipping & Delivery
Product Recalls
Help Center
My Preference Center
Privacy & Security Center

## Resources

Specials & Offers
Military Discount Benefit
Truck & Tool Rental
Protection Plans
Manufacturer and Municipality Rebates
Gift Cards

## About Us

Careers
Corporate Information
Digital Newsroom
Home Depot Foundation
Investor Relations
Government Customers
Suppliers & Providers
Eco Actions

Special Financing Available everyday*

Pay & Manage Your Card

Credit Offers

## Our Other Sites

The Home Depot Canada  The Home Depot México  Pro Referral

© 2000-2024 Home Depot. All Rights Reserved. Use of this site is subject to certain Terms Of Use.
Local store prices may vary from those displayed. Products shown as available are normally stocked but inventory levels cannot be guaranteed.
For screen reader problems with this website, please call 1-866-333-3551 or text 78465 (standard carrier rates apply to texts).

Store Locator ©2000-2024 Home Depot Privacy & Security Statement Terms My Preference Center California Privacy Rights & Report
Limit the Use of My Sensitive Personal Information Do Not Sell or Share My Personal Information California Supply Chain Act Site Map Store Directory



PLAINTIFF'S EXHIBIT
PL103-187

**From:** **eBay** ebay@ebay.com
**Subject:** Julio, your order is confirmed
**Date:** October 29, 2024 at 10:56 PM
**To:** jravada@icloud.com

# Welcome back Julio! Thanks for another purchase.

View order details

Browse deals

Your order will ship to:
Julio Ravada
2275 E Belding Dr
Palm Springs, 92262-6515 CA
United States

Estimated delivery:
**Fri, Nov 01 - Mon, Nov 04**

## Your order details

We'll let you know when your order has shipped.



Brand New Replacement Apple Watch Series 5 White Ceramic Case (40MM)

PLAINTIFF'S EXHIBIT
PL103-188



eBay Money Back Guarantee

| | |
|---|---|
| Price: | **$2,099.95** |
| Item ID: | 296328366533 |
| Order number: | 27-12238-62904 |
| Seller: | guptabubu<br>100% positive (3,592)<br>Explore more from this seller |

# Sponsored items to complement your purchase



LAST ONE

Apple Watch Series 5 40m...

**$99.99**

Buy it now

Free shipping



Apple Watch Nike Series...

**$94.99**

Or Best Offer



Apple Watch. Series 5 Ex...

**$115.00**

Or Best Offer



Apple Watch Series 5 40m...

**$99.99**

Or Best Offer

PLAINTIFF'S EXHIBIT

PL103-189

Or Best Offer Or Best Offer
Free shipping

Order total:

| | |
|---|---|
| Subtotal | $2,099.95 |
| Shipping | Free |
| Sales tax | $194.25 |
| Total charged to VISA x -3166 | $2,294.20 |

## Your eBay, your way

Get price drop alerts and track your orders with our top-rated app.

Get the eBay app

Money Back Guarantee

PLAINTIFF'S EXHIBIT
PL103-190

**The Great Summer Sale.** Ends Sunday. Limited quantities. No rainchecks. Shop now



‹ See all orders

# Order Details

Print Receipt

**Purchase Date:** Feb 09, 2022 **Order Number:** BBY01-806591032922 **Total:** $1,789.72 Payment Details



**Store Pickup**

**Picked up on Feb 10, 2022 at Northridge, CA.**

**Store Pickup**
NORTHRIDGE CA

**Pickup Person**
Robert Cannon

**TCL - 55" Class 4-Series LED 4K UHD Smart Google TV**

**Get Product Support**




**Model:** 55S446
**SKU:** 6470247
**Quantity:** 1

| | |
|---|---|
| **Item Total:** | $360.80 |
| Product Price: | $329.99 |
| **Discounts** | |
| Reward Certificates: | -$5.97 |
| Sales Tax, Fees & Surcharges: | $30.78 |
| **Non-Taxable Fees** | |
| RECYCLING_FEE: | $6.00 |

Review for a chance to win a **$400 gift card**. Write a Review

**Shipment**

**Delivered on Feb 11, 2022**

**Shipping Address**
Julio Ravada
19525 SCHOOLCRAFT ST
RESEDA, CA 91335 US



PLAINTIFF'S EXHIBIT
PL103-191

**Apple Watch Edition (GPS + Cellular) 42mm Ceramic Case with Soft White/Pebble Sport Band**

**Get Product Support**



**Serial:** SFH7W700KJ6GL
**Model:** MQKD2LL/A
**SKU:** 6090620
**Quantity:** 1

| | |
|---|---|
| **Item Total:** | $1,428.92 |
| Product Price: | $1,329.00 |
| **Discounts** | |
| Reward Certificates: | -$24.03 |
| Sales Tax, Fees & Surcharges: | $123.95 |

Review for a chance to win a **$400 gift card**. Write a Review

## Digital Item

### Ready to Redeem

We've emailed you instructions on how to redeem your item.

**Digital Delivery**
jravada@icloud.com

**Apple - Free Apple TV+ for 3 months (new or qualified returning subscribers only)**

**Model:** DIGTIAL ITEM
**SKU:** 6484511
**Quantity:** 1

| | |
|---|---|
| **Item Total:** | $0.00 |
| Product Price: | $0.00 |
| Sales Tax, Fees & Surcharges: | $0.00 |

Review for a chance to win a **$400 gift card**. Write a Review

Included free with this item. Show Item

### Best Buy Support

Browse our Support Center for answers to frequently asked questions.
Get help ›

Feedback

Visit our Support Center
Check your Order Status
Shipping, Delivery & Store Pickup
Returns & Exchanges
Price Match Guarantee



PLAINTIFF'S EXHIBIT
PL103-192

**Order & Purchases**

Check Order Status

Shipping, Delivery & Pickup

Returns & Exchanges

Price Match Guarantee

Product Recalls

Trade-In Program

Gift Cards

**Support & Services**

Visit our Support Center

Shop with an Expert

Schedule a Service

Manage an Appointment

Protection & Support Plans

Haul Away & Recycling

Contact Us

**Partnerships**

Affiliate Program

Advertise with Us

Developers

Best Buy Health

Best Buy Education

Best Buy Business

Sign in or Create Account

**Get the latest deals and more.**

Enter email Sign Up

**Best Buy app**

**Learn more ›**

**Payment Options**

My Best Buy® Credit Card

Pay Your Bill at Citibank

Lease to Own

**Rewards & Membership**

My Best Buy Memberships

View Points & Certificates

Member Offers

**About Best Buy**

Corporate Information

Careers

Corporate Responsibility

Sustainability

How was your experience? Give feedback about our website

Mobile Site Best Buy Canada

Accessibility Terms & Conditions Privacy Interest-Based Ads State Privacy Rights Health Data Privacy Do Not Sell/Share My Personal Information Limit Use of My Sensitive Personal Information Targeted Advertising Opt Out CA Supply Chain Transparency Act

In-store pricing may vary. Prices and offers are subject to change. © 2024 Best Buy. All rights reserved. BEST BUY, the BEST BUY logo, the tag design, and MY BEST BUY are trademarks of Best Buy and its affiliated companies.



PLAINTIFF'S EXHIBIT
PL103-193